837 A.2d 1044

**In re ARIEL G.**

No. 1570, Sept.Term, 2002.

Court of Special Appeals of Maryland.

Dec. 10, 2003.

Julia Doyle Bernhardt (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Nancy C. Hopkins (J. Joseph Curran, Jr., Attorney General on the brief), Baltimore, for appellee.

Argued before DAVIS, SALMON, and CHARLES E. MOYLAN JR. (Ret., Specially Assigned), JJ.

SALMON, Judge.

Ariel G., who was born on January 28, 1991, is the son of Teresa Brock. On September 18, 2000, the Circuit Court for Baltimore City found Ariel to be a child in need of assistance (CINA) and placed him in the custody of the Baltimore City Department of Social Services (BCDSS).

The BCDSS put Ariel in a Carroll County foster home, but on January 9, 2001, he left the home without permission. Police looked for Ariel's mother, Ms. Brock, but could not

locate her. Soon thereafter, the police came to believe that Ms. Brock had absconded with Ariel.

Meanwhile, Ms. Brock had been charged in the Circuit Court for Baltimore City with constructive contempt of court for other (unrelated) misconduct involving Ariel. A bail hearing was held on August 3, 2001, on the constructive contempt matter.

After bail was set, Ms. Brock was brought back into court, before the same judge who had presided at the bond hearing but who was then sitting in his capacity as a juvenile court judge. A hearing was held by the juvenile court judge concerning the whereabouts of Ariel. Ms. Brock objected to the hearing, on the ground that neither she nor her counsel had received adequate notice of the hearing. Counsel said:

First and foremost, I've not been given any notice of what proceeding was going to be called when your office called me this afternoon at two o'clock and left a message; it was simply that Ms. Brock was here and to get over here. And I've done so. The first thing that I was presented with was a constructive criminal contempt petition that was served on my client and myself, and I've dealt with that matter. I have no idea what Mr. Cohen [an attorney for the BCDSS] intends to call. I was only told that whatever CINA cases would also be added to the docket. I have a great concern, Your Honor, with notice in both of these matters. That effectively, I received notice at two o'clock this afternoon that my client was going to be brought before the court. All I was told about the CINA case is that they were adding a CINA case to the docket. And now I hear that it's the civil contempt, when we've just dealt with the criminal contempt. I have not received any notice of any petition of the civil contempt Your Honor.

The prosecutor responded,

Your Honor, there is no petition. The issue is that Ms. Brock has absconded with the child. The court needs to ask her where the child is and then we'll deal with what happens after [unclear]. There's no petition in this case yet. Until

the court confronts Ms. Brock with the question as to whether or not she's in contempt of court.

The court was informed by Mr. Cohen that two representatives of the Carroll County State's Attorney's office had advised him that Ms. Brock "had indicated that she does have the child." The court then asked Ms. Brock, "Do you know anything about the whereabouts of Ariel G.?" After conferring with counsel, Ms. Brock declined to answer the question on Fifth Amendment grounds. Immediately thereafter, the court said, "Well, I find you in contempt. And you will remain in jail until you purge yourself of that contempt by revealing the whereabouts of Ariel G."

A written order was entered by the court that read, in pertinent part:

The following order(s) resulted from a Child in Need of Assistance hearing. As a result of the other (miscellaneous) hearing in the above case(s), the Court finds:

The mother was present, and represented by APD [Assigned Public Defender] Beverly Schulterbrandt.

The BCDSS posed the question to the mother as to the whereabouts of her son.

The court asked the mother the question as to the whereabouts of her son.

The mother invoked her 5th Amendment to remain silent. The court ordered that the mother remain in the BCDC [Baltimore City Department of Corrections] under Civil Contempt, until she purges the contempt by revealing the whereabout of her son.

It is further ordered that the Clerk of the Court cause a copy of this order to be served upon the parties to this proceeding.

So ordered by this Court, on this 6th day of August, 2001.

No appeal was filed from the August 6, 2001, order.

A purge review hearing was held on January 16, 2002, and Ms. Brock again refused to answer the court's question as to the whereabouts of Ariel G. Due to her failure to answer the

same question as previously posed, her imprisonment was continued.

Another purge hearing was held on June 5, 2002. This time Ms. Brock said she did not know Ariel's present whereabouts because she had not seen him for ten months. The following then transpired,

[COUNSEL FOR BCDSS]: Where were you when you last saw him ten months ago?

A. I have to plead the Fifth on that.

Q. I can't hear you.

A. I cannot answer that at this time. I have a [pending] criminal case. I take the Fifth Amendment. I have a case pending in Carroll County.

Q. Okay. So your answer is that you take the Fifth Amendment, right? But the last time you saw him you said was ten months ago?

The criminal charges to which Ms. Brock referred were charges pending in Carroll County arising from her (alleged) act of absconding from the foster home with Ariel G.

The court orally ruled as follows:

She knew where he was ten months ago. Now that question has been asked and she will not reveal where he was ten months ago based on her Fifth Amendment privilege. And the problem that I have is if she was willing to tell [where] he was ten months ago then there would have be[en] an attempt to purge but there has been no attempt to purge.

\* \* \*

She hasn't answered the question. And (unintelligible) where the child is and she certainly knew where he was ten months ago. The child is committed to the Department of Social Services and she took him away from the Department of Social Services.

\* \* \*

She has not purged herself of the civil contempt, and she will be returned to the jail.

The juvenile court judge's June 26, 2002, order read, in relevant part:

The following order(s) resulted from a Child in Need of Assistance hearing. As a result of the Review hearing in the above case(s), the Court finds:

Respondent's mother—Teresa Brock [-] was transported to court by BCDC. Respondent still remains missing and has an outstanding runaway warrant out on him. Mother has a pending case in Carroll County.

Mother—Teresa Brock [-] has failed to advise the [c]ourt of . . . [r]espondent's whereabouts. Mother—Teresa Brock [-] is still in Civil Contempt and is remanded to BCDC.

An appeal was filed from the June 26, 2002, order.

Ms. Brock had another purge hearing on September 26, 2002, at which she again failed to divulge the whereabouts of Ariel G. The juvenile court, by an order dated September 29, 2002, ruled that Ms. Brock was still in contempt. No appeal was taken from the September 29, 2002, order.

Sometime after September 29, 2002, Ariel G. was located by BCDSS. He was placed with relatives, and Ms. Brock was released from custody on the contempt charge(s).

## QUESTIONS PRESENTED

1. Was this appeal timely filed?
2. Where Ms. Brock faced pending charges of [absconding with] her child from foster care, and was at risk of criminal contempt charges, was the contempt order [resulting from her failure to testify as to where she was when she last saw her child] entered in violation of Ms. Brock's privilege against self-incrimination?
3. Did the lower court violate the Maryland Rules and principles of due process by holding Ms. Brock in direct civil contempt when she invoked her privilege against

self-incrimination and refused to disclose her knowledge of the whereabouts of her child?

## I. *FIRST ISSUE*

Generally speaking, persons held in contempt of court are entitled to maintain an appeal from a contempt finding despite having been released from the imprisonment brought about by the (alleged) contempt. *Droney v. Droney*, 102 Md.App. 672, 682, 651 A.2d 415 (1995) ("With contempt ... even if the purge cannot be undone, and thus the party cannot be made 'whole,' the party remains entitled to seek exoneration of the contempt finding."); *Williams v. Williams*, 63 Md.App. 220, 225–26, 492 A.2d 649 (1985)(same); *Jones v. State*, 61 Md.App. 94, 96, 484 A.2d 1050 (1984)(same). In this case, however, no immediate appeal order was filed from the initial order holding appellant in contempt, nor were appeals filed from the orders dated January 16, 2002, and September 29, 2002, in which the court ruled that appellant had failed to purge herself of contempt.

It is now too late to file an appeal as to the orders filed on August 6, 2001; January 16, 2002; and September 29, 2002. The period for filing an appeal expired thirty days after that order was entered.[1] Appellant failed to file an appeal from these contempt findings within thirty days. *See Droney* 102 Md.App. at 681, 651 A.2d 415 (citing and applying rule that parties must file any appeals within thirty days of the entry of judgment).

The question then becomes: Is it now too late to file an appeal from the June 26, 2002, order in which the court made a written finding that appellant had failed to purge herself of contempt?

---

1. *See* Md.Code Ann., Cts. & Jud. Proc. § 12–304(a) (2001); Md. Rule 2–601(b) (fixing the date for filing appeals from final judgments); Md. Rule 8–202(a)("[T]he notice of appeal shall be filed within 30 days after entry of the judgment or order from which the appeal is taken.").

*United States v. Wheeler,* 952 F.2d 326 (9th Cir.1991), involved a defendant who was ordered by the Court to turn over certain records to the Internal Revenue Service. *Id.* at 326–27. The defendant failed to comply with the court's order and was held in contempt. *Id.* at 327. The defendant did not appeal that order, but about five months after being held in contempt, the defendant filed a pleading that the District Court treated as a motion to vacate the earlier contempt order. *Id.* The *Wheeler* Court held that "a district court's order refusing to vacate an underlying contempt order is nonappealable when the ground on which vacatur is sought existed at the time the contempt order was entered and the contemnor failed to appeal timely from the order." *Id.* at 327. The *Wheeler* Court went on to say:

[I]f a contemnor may appeal an order denying vacatur of a contempt order merely by a continuing inability to comply with the order, the time limit of Fed. R.App. P. 4(a) will have little meaning. The contemnor would be able to indefinitely extend the deadline for appealing the issue of his ability to comply.

*Id.*

The court's order of June 26, 2002, however, stands on a different legal footing from the order discussed in *Wheeler.* First, this case does not involve a motion to vacate a contempt finding. Second, the purportedly contemptuous conduct that caused the court to rule in June 2002 that the contempt had not been purged was different from the conduct that had caused the original contempt finding. As mentioned earlier, at the first and second hearings, the question appellant refused to answer was, in substance: "Where is the child?" When appellant was asked at the June 2002 hearing that same question, she said she did not know Ariel G.'s present whereabouts. That answer was not contradicted or impeached.

The question appellant refused to answer at the June 2002 hearing was: "Where were you when you last saw [Ariel G.] ten months ago?" The court ruled that appellant had not purged the contempt by failing to answer that new question.

Appellant filed an appeal within thirty days of the June 26, 2002, order from that contempt finding.[2] As to the order dated June 26, 2002, the appeal was timely. *See United States v. Brumfield,* 188 F.3d 303, 306 (1999)(an order holding that an individual who has been adjudicated in contempt had not purged himself of contempt is a final appealable order); *see also Consolidated Rail Corp. v. Yashinsky,* 170 F.3d 591, 594 (6th Cir.1999); *Doe v. United States (In re Grand Jury Subpoena),* 150 F.3d 170, 172 (2d Cir.1998).

Based on the federal precedent above mentioned, we hold that the appeal from the June 26, 2002, order was timely.

## II.

Appellant contends that she had a right, protected by the Fifth Amendment to the Constitution of the United States, to refuse to answer the question, "Where were you when you last saw [Ariel G.] ten months ago?"

[T]he privilege against compelled self-incrimination, under both the Fifth Amendment and Article 22 of the Declaration of Rights, must be accorded a liberal construction in favor of the right that it was intended to secure.

*Choi v. State,* 316 Md. 529, 536, 560 A.2d 1108 (1989)(internal quotation marks omitted).

We have consistently applied the standards of *Hoffman v. United States,* 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951), that a witness is entitled to invoke the privilege against self-incrimination if "the witness has reasonable cause to apprehend danger from a direct answer: ... and that:

To sustain the privilege, it need only be evidence from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.

---

**2.** The court's June 26, 2002, order does not accurately state the nature of the question appellant refused to answer.

The Court in *Hoffman* concluded that, in the case before it, the claim of privilege should have been allowed because the witness "could reasonably have sensed the peril of prosecution" and because "it was not *'perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency' to incriminate."

*Id.* at 536–37, 560 A.2d 1108 (citations omitted)(emphasis in original).

The BCDSS claims that appellant had no Fifth Amendment right to refuse to answer the question propounded at the June 2002 purge hearing. It bases its position almost entirely on *Baltimore City Department of Social Services v. Bouknight*, 493 U.S. 549, 551–52, 110 S.Ct. 900, 107 L.Ed.2d 992 (1990). The *Bouknight* case involved the BCDSS's efforts to locate Maurice M. ("Maurice"), the son of Bouknight. Due to abuse visited upon Maurice by Ms. Bouknight, Maurice was adjudicated to be a CINA and placed under BCDSS's supervision. *Id.* at 552, 110 S.Ct. 900. BCDSS, despite the abuse, agreed that Maurice should remain in Ms. Bouknight's custody, "but only pursuant to extensive conditions set forth in a court-approved protective order." *Id.* Among the conditions in the protective order, to which Ms. Bouknight agreed, were requirements that she "cooperate with BCDSS, follow a prescribed training regimen and be subject to further court orders." *Id.* at 559, 110 S.Ct. 900.

Eight months after the consent order was signed, BCDSS returned to the juvenile court and asked that Maurice be removed from Ms. Bouknight's care and custody. The BCDSS was concerned, *inter alia*, that Maurice might be dead because Ms. Bouknight would not reveal his whereabouts, nor had the BCDSS been able to locate Maurice through its own investigative efforts. *Id.* at 552–53, 110 S.Ct. 900.

Ms. Bouknight was held in contempt by the juvenile court due to her failure to produce Maurice after having been ordered by the court to do so. The juvenile court (1) rejected Ms. Bouknight's claim that the contempt order violated her

Fifth Amendment privilege against self-incrimination and (2) ordered that she be imprisoned until she produced the child. *Id.* The Maryland Court of Appeals reversed, holding that the contempt order unconstitutionally compelled Ms. Bouknight to admit, through the act of production, "a measure of continued control and dominion over Maurice's person," even though Ms. "Bouknight had a real apprehension that she will be prosecuted." *In re Maurice M.,* 314 Md. 391, 404, 550 A.2d 1135 (1988).

The United States Supreme Court reversed the Maryland Court of Appeals, holding:

> The possibility that a production order will compel testimonial assertions that may prove incriminating does not, in all contexts, justify invoking the privilege to resist production. *See infra,* at 556–558[110 S.Ct. 900]. Even assuming that this limited testimonial assertion is sufficiently incriminating and "sufficiently testimonial for purposes of the privilege," *Fisher* [*v. United States,* 425 U.S. 391], 411, 96 S.Ct. 1569, 48 L.Ed.2d 39 [(1976)], *Bouknight may not invoke the privilege to resist the production order because she has assumed custodial duties related to production and because production is required as part of a noncriminal regulatory regime.*

493 U.S. at 555–56, 110 S.Ct. 900 (emphasis added).

The Supreme Court's *Bouknight* holding was based on a line of cases in which it had held that "the ability to invoke the privilege may be greatly diminished when invocation would interfere with the effective operation of a generally applicable, civil regulatory requirement"—in contrast to enforcement directed at a select group suspected of criminal activity. *Id.* at 557–58, 110 S.Ct. 900.

After discussing several cases in which the Supreme Court had recognized "the Fifth Amendment privilege may not be invoked to resist compliance with a regulatory regime constructed to effect the State's public purposes unrelated to the enforcement of its criminal laws," the Court concluded:

Once Maurice was adjudicated a child in need of assistance, his care and safety became the particular object of the State's regulatory interests. *See* 314 Md. at 404, 550 A.2d at 1141; Md. Cts. & Jud. Proc.Code Ann. §§ 3–801(e), 3–804(a)(Supp.1989); *see also* App. 105 ("This court has jurisdiction to require at all times to know the whereabouts of the minor child. We asserted jurisdiction over that child in the spring of 1987 . . ."). Maryland first placed Maurice in shelter care, authorized placement in foster care, and then entrusted responsibility for Maurice's care to Bouknight. By accepting care of Maurice subject to the custodial order's conditions (including requirements that she cooperate with BCDSS, follow a prescribed training regime, and be subject to further court order), *Bouknight submitted to the routine operation of the regulatory system and agreed to hold Maurice in a manner consonant with the State's regulatory interests and subject to inspection by BCDSS. Cf. Shapiro v. United States, supra*[335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948)]. In assuming the obligations attending custody, Bouknight "has accepted the incident obligation to permit inspection." *Wilson,* 221 U.S. at 382, 31 S.Ct. 538. The State imposes and enforces that obligation as part of a broadly directed, noncriminal regulatory regime governing children cared for pursuant to custodial orders. *See* Md. Cts. & Jud. Proc.Code Ann. § 3–802(a)(1984)(setting forth child protective purposes of subtitle, including "providing for the care, protection, and wholesome mental and physical development of children coming within the provisions of this subtitle"); *see also* Md. Cts. & Jud. Proc.Code Ann. §§ 3–820(b), (c)(Supp.1989); *In re Jessica M.,* 312 Md. 93, 538 A.2d 305 (1988).

Persons who care for children pursuant to a custody order, and who may be subject to a request for access to the child, are hardly a "selective group inherently suspect of criminal activities." *Marchetti*[v. *United States] supra,* [390 U.S. 39] at 57, [88 S.Ct. 697, 19 L.Ed.2d 889 (1968)] (quoting *Albertson v. Subversive Activities Control Board, supra*[382 U.S. 70] at 79[86 S.Ct. 194, 15 L.Ed.2d 165 (1965)]. The

juvenile court may place a child within its jurisdiction with social service officials or "under supervision in his own home or in the custody or under the guardianship of a relative or other fit person, upon terms the court deems appropriate." Md. Cts. & Jud. Proc.Code Ann. § 3–820(c)(1)(i)(Supp.1989). Children may be placed, for example, in foster care, in homes of relatives, or in the care of state officials. *See, e.g., In re Jessica M., supra; In re Arlene G.,* 301 Md. 355, 483 A.2d 39 (1984); *Maryland Dept. of Health and Mental Hygiene v. Prince George's County Dept. of Social Services,* 47 Md.App. 436, 423 A.2d 589 (1980). Even when the court allows a parent to retain control of a child within the court's jurisdiction, that parent is not one singled out for criminal conduct, but rather has been deemed to be, without the State's assistance, simply "unable or unwilling to give proper care and attention to the child and his problems." Md. Cts. & Jud. Proc.Code Ann. § 3–801(e)(Supp.1989); *see In re Jertrude O.,* 56 Md.App. 83, 466 A.2d 885 (1983); *cert. denied,* 298 Md. 309, 469 A.2d 863 (1984). The provision that authorized the juvenile court's efforts to gain production of Maurice reflects this broad applicability. *See* Md. Cts. & Jud. Proc.Code Ann. § 3–814(c)(1984)("If a parent, guardian, or custodian fails to bring the child before the court when requested, the court may issue a writ of attachment directing that the child be taken into custody and brought before the court. The court may proceed against the parent, guardian, or custodian for contempt"). This provision "fairly may be said to be directed at ... parents, guardians, and custodians who accept placement of juveniles in custody." 314 Md. at 418, 550 A.2d at 1148 (McAuliffe, J., dissenting).

*Id.* at 559–60.

As can be seen, the Supreme Court placed heavy emphasis on the fact that Ms. Bouknight had, prior to being held in contempt, agreed to assume various obligations, which accompanied the grant to her of custody of Maurice, including her obligation to hold her son "in a manner consonant with the State's regulatory interest and subject to inspection by

BCDSS." According to the Supreme Court majority, enforcement of the regulatory scheme as against Ms. Bouknight was not directed against a selective group suspected of criminal activity, inasmuch as Ms. Bouknight had agreed to the regulatory scheme and had agreed to cooperate with BCDSS in the enforcement of its regulatory scheme.

Factually, the case *sub judice* is distinguishable from *Bouknight* for the following reasons: (1) appellant never agreed to cooperate with BCDSS in any fashion; (2) Ms. Brock was never asked to produce anything; instead, she was held in contempt for her refusal to give testimony; and (3) BCDSS was not entitled to an answer to the question she refused to answer because a response was not required "as a part of a non-criminal regulatory regime."

BCDSS makes the following argument:

In *Bouknight*, the Supreme Court found that the juvenile court's requests for access to the child did

not 'focus almost exclusively on conduct which [is] criminal.' [*California v.*] *Byers*, 402 U.S. [424,] 424[ (1971)], 91 S.Ct.[1535] at 1551 (Harlan, J., concurring in judgment). Many orders will arise in circumstances entirely devoid of criminal conduct. Even when criminal conduct may exist, the court may properly request production and return of the child, and enforce that request through the exercise of the contempt power, for reasons related entirely to the child's well-being and through measures unrelated to criminal law enforcement or investigation.

*Bouknight*, 493 U.S. at 560–61, 110 S.Ct. 900.

Appellant's argument to the contrary notwithstanding, *Bouknight* sets the standard against which Teresa B.'s Fifth Amendment claim must be scrutinized. While the Supreme Court in *Bouknight* addressed this issue from the standpoint of the court's order to produce the child, there is simply no appreciable difference in an order requiring production of a child and an order requiring the disclosure of the child's whereabouts. Moreover, reading *Bouknight* together with *California v. Byers*, 402 U.S. 424, 91 S.Ct. 1535,

29 L.Ed.2d 9 (1971), on which the *Bouknight* Court relied, also leads to the conclusion that Teresa B.'s silence in this case was not entitled to protection.

We disagree. First, the above excerpt from the *Bouknight* opinion chosen by BCDSS is inapposite because (1) this case does not involve a refusal to produce and (2) the June 2002 order of court did not arise "in circumstances entirely devoid of criminal conduct," because appellant invoked her Fifth Amendment privilege after she had been charged with criminal activity that was clearly linked to the question she refused to answer.

BCDSS reads the order dated June 2002 as meaning that appellant was held in contempt for failing to divulge Ariel's present whereabouts. If that reading of the June 2002 order were accurate, the order could not possibly be affirmed because there was no evidence from which it could be inferred that the appellant gave an untruthful answer when she said she did not know her son's present whereabouts; accordingly, the court had no right to hold appellant in contempt for giving the "I do not know" answer.

Appellant interprets the June 2002 order to mean that she was being held in contempt for failing to answer the question, "Where were you when you last saw Ariel G. ten months ago?" We believe appellant's interpretation to be correct based on what the judge said immediately after appellant's June 2002 testimony. Refusal to answer that question is appreciably different from the failure by the mother in *Bouknight* to comply with an order to produce her child. This latter statement is true, *inter alia*, because, unlike a failure to produce a minor child, a failure to answer the question here at issue "would not interfere" with the effective operation of a generally applicable, "civil regulatory requirement."

We hold that appellant had a right, protected by the Fifth Amendment to the United States Constitution, to decline to answer when asked where she was ten months previously when she last saw her son inasmuch as she had "reasonable cause to apprehend danger from a direct answer" in light of

the pending Carroll County charges.[3] *Hoffman v. United*

---

**3.** The appellee did not contend that appellant waived her Fifth Amendment privilege when she answered the question concerning the present whereabouts of her child. It is understandable why no such contention was raised. In 5 LYNN McLAIN, MARYLAND EVIDENCE § 514.3 (1987), the author states:

> A witness who is not a criminal defendant in the case being tried has no privilege not to take the stand and waives no privilege by taking the stand. *The witness waives the privilege against self-incrimination only if the witness is asked a question which calls for an answer which will tend to incriminate the witness, and the witness fails to assert the privilege but instead answers the question.* Once a witness has disclosed certain incriminating facts, the privilege is unavailable with regard to the details: no further risk of incrimination remains. (Footnotes omitted)(emphasis added).

Appellant's answer (given in a civil proceeding) that she did not know her child's present whereabouts because she had not seen him in ten months was not one that would tend to incriminate her. Ariel G., at the time she gave that answer, had been "AWOL" for about seventeen months. On the other hand, the question appellant declined to answer had the potential of incriminating her because a truthful answer might well have enabled the State to "backtrack" Ariel G.'s activities and thereby prove that appellant had a hand in his elopement from BCDSS's custody.

*Rogers v. United States*, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951), is the lead case regarding the waiver of a witness's Fifth Amendment privilege. The discussion of *Rogers* in 3 WAYNE LaFAVE ET AL., CRIMINAL PROCEDURE § 8.10(e) (2d ed.1999), is illuminating:

> **(e) Waiver.** Assuming the witness receives whatever warnings, if any, that are constitutionally required, the privilege may be relinquished by the witness without an express statement of waiver. When the witness answers the question, his waiver is automatically assumed. Indeed, a witness may, by providing certain incriminating information, relinquish her right to raise the privilege with respect to further incriminating information. *Rogers v. United States* is the leading case on such "testimonial waiver." The witness there testified before a grand jury that, as treasurer of [the] Communist Party of Denver, she had been in possession of party records, but had subsequently delivered those records to another person. She refused, however, to identify the recipient of the records, asserting that would be incriminating. A divided Supreme Court affirmed her contempt conviction, holding the privilege inapplicable. The Court noted that Rogers had already incriminated herself by admitting her party membership and past possession of the records; disclosure of her "acquaintanceship with her successor present[ed] no more than a 'mere imaginary possibility' of increasing the danger of prosecution." A witness would not be allowed to disclose a basic incriminating fact and then claim the privilege as to "details." To uphold such a claim of the privilege would "open the way to distortion of facts by permitting a witness to select any stopping point in her testimony."

*States,* 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). Therefore, the trial court erred in holding appellant in contempt for failure to answer that question.

## III.

In view of our holding that appellant had a Fifth Amendment privilege to refuse to answer the question that led to the contempt finding, there is no need to answer the question of whether the court failed to follow the requirements of the Maryland Rules prior to entering a contempt finding.

**JUDGMENT REVERSED; COSTS TO BE PAID BY APPELLEE.**

---

Although *Rogers* often is described as posing great danger for the witness who answers even seemingly "innocuous questions," the decision actually is fairly limited. Courts have held, for example, that where a witness' initial admission related to only one element of an offense, that did not constitute a waiver as to questions that might require him to admit other elements of the offense. The fact that the second question asks for further detail as to the same event does not in itself establish that the privilege is not available. Indeed, most of the reported cases finding waiver have involved, as did *Rogers,* a refusal to "name others" in a setting in which it appears likely that the witness is concerned about incriminating those persons rather than herself.

(Footnotes omitted)(alteration in original).

Lastly, an inference that appellant waived her Fifth Amendment privilege would require a determination that she began her testimony "freely and voluntarily, knowing that [her] answer to any questions would be interpreted as a waiver." *Martin v. Flanagan, State's Attorney,* 259 Conn. 487, 789 A.2d 979, 987 (2002). No warnings were given in this case and therefore no such inference can be drawn.