858 A.2d 1007

**In re ARIEL G.**

**No. 9, Sept. Term, 2004.**

Court of Appeals of Maryland.

Oct. 5, 2004.

Nancy C. Hopkins, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for Petitioner.

Julia Doyle Bernhardt, Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), Baltimore, for Respondent.

Argued Before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, Judge.

On 17 September 1996, the Baltimore City Department of Social Services (BCDSS) took then five year old Ariel G. into protective custody from his mother, Teresa B. BCDSS promptly filed a petition in the Circuit Court for Baltimore City alleging that Ariel was a Child in Need of Assistance (CINA) based on his mother's refusal to provide him with appropriate medical treatment for his severe asthma. After the court entered an order placing Ariel in protective custody, but before an adjudicatory hearing could be held, Teresa absconded with Ariel.

After three and a half years of eluding the authorities, Teresa was found and arrested on 27 March 2000. Although she refused to disclose Ariel's whereabouts, he subsequently was found and committed by the court to BCDSS under an order of shelter care. The court found Teresa in direct contempt for preventing the court from exercising its jurisdiction over Ariel. She also later was convicted of a violation of the terms of her probation.[1]

Later that year, the court found Ariel to be a CINA and placed him in a foster home in Carroll County. Ariel remained in the foster home until the morning of 9 January 2001, when the foster parents discovered that Ariel was missing from his bedroom. Attempts to locate his mother were unsuccessful, and it was widely speculated that Teresa again had fled with Ariel.

Over the next few months the juvenile court held hearings during which evidence was adduced that, if believed, strongly indicated that Teresa was involved in Ariel's latest disappearance and that Ariel was with her currently. In fact, the prosecutor in Carroll County charged Teresa with kidnapping.[2] In addition, the State charged her with constructive

---

1. On 19 January 2001, the Court of Special Appeals, in an unreported opinion, overturned the conviction for direct contempt and the violation of probation.

2. At the time of oral argument in the present case, we were informed that the kidnapping charge against Teresa remained pending.

criminal contempt for conduct unrelated to Ariel's 9 January 2001 disappearance.[3]

Teresa was apprehended once more and jailed in Baltimore City pending a bail hearing. Ariel's whereabouts, however, were unknown. On 3 August 2001, the Circuit Court for Baltimore City held a bail hearing. The court instructed Teresa's counsel in the CINA case to appear with Teresa at a hearing that afternoon. The court, now sitting as a juvenile court, directly questioned Teresa concerning Ariel's whereabouts. Teresa refused to answer, claiming that she was not required to do so based on her Fifth Amendment privilege against self-incrimination. The court found Teresa in direct contempt and ordered her detained until she purged herself of the contempt by disclosing Ariel's whereabouts. The court periodically brought her back over the ensuing months, but each time she refused to answer questions concerning Ariel's whereabouts, resulting in her continued incarceration.

On 5 June 2002, Teresa was brought before the juvenile court once more and given the opportunity to purge her contempt by disclosing the whereabouts of Ariel. Teresa responded by indicating that, because she had been detained for the last ten months, she no longer had knowledge as to Ariel's present location. The court then suggested Teresa could purge the contempt by disclosing where she was the last time she saw Ariel prior to her capture and confinement. Teresa refused to answer this question, invoking again her right against self-incrimination. After Teresa refused once more at a hearing on 26 September 2002 to disclose any information concerning her child's whereabouts, Ariel nonetheless was found by BCDSS and placed with relatives. Teresa was released from custody.[4]

---

**3.** This charge was based on Teresa's interference with a master's shelter care order. Although Teresa was convicted of this offense also, the Court of Special Appeals reversed the conviction in another unreported opinion filed 12 November 2003.

**4.** Although Teresa was released from custody, she retained a right of appeal as to the contempt determination because Maryland law allows

Teresa appealed to the Court of Special Appeals from the Circuit Court's 5 June 2002 order finding her in contempt for her refusal to answer questions concerning the last known whereabouts of Ariel.[5] On 10 December 2003, the intermediate appellate court reversed the decision of the juvenile court, concluding that Teresa had a Fifth Amendment privilege to refuse to answer questions regarding her knowledge of Ariel's whereabouts. *In re Ariel G.*, 153 Md.App. 698, 712–13, 837 A.2d 1044, 1052 (2003). The Court of Special Appeals reasoned that the kidnapping charges pending against Teresa in Carroll County presented "reasonable cause to apprehend danger from a direct answer" to such questions. *Id.* BCDSS sought review in the Court of Appeals by writ of certiorari, which we granted on 8 April 2004. *In re Ariel G.*, 380 Md. 617, 846 A.2d 401 (2004).[6]

## I.

The Fifth Amendment to the United States Constitution provides that "No person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. In order to invoke successfully the protection of the Fifth Amendment, an individual's statement must be compelled, testimonial, and self-incriminating. *Fisher v. U.S.*, 425 U.S. 391, 408, 96 S.Ct. 1569, 1579, 48 L.Ed.2d 39 (1976)

---

individuals to appeal from a contempt finding despite having been released from the imprisonment brought about by the contempt. *Droney v. Droney*, 102 Md.App. 672, 681–82, 651 A.2d 415, 419–20 (1995).

5. Although the juvenile court held Teresa in contempt on several occasions over the relevant 13 month period, the Court of Special Appeals held that Teresa's appeal was timely only as to the 5 June 2002 order. *In re Ariel G.*, 153 Md.App. 698, 705–06, 837 A.2d 1044, 1048 (2003).

6. The sole question posed in BCDSS's petition for certiorari was: "Did the Court of Special Appeals misconstrue *Baltimore City Department of Social Services v. Bouknight*, 493 U.S. 549[, 110 S.Ct. 900, 107 L.Ed.2d 992] (1990), in holding that a juvenile court, in exercising its jurisdiction for the protection of a child who has been found to be a Child in Need of Assistance, cannot compel the parent of the child to reveal the child's whereabouts when the child is missing?"

(stating that the Fifth Amendment "applies only when the accused is compelled to make a *testimonial* communication that is incriminating"). This right against self-incrimination is based on the "conviction that too high a price may be paid even for the unhampered enforcement of the criminal law and that, in its attainment, other social objects of a free society should not be sacrificed." *Hoffman v. U.S.*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951) (citations omitted). To accomplish this aim, the Fifth Amendment allows an individual to refuse, without threat of punishment, to respond to questions the answers to which not only would support a criminal conviction, but also those that would "furnish a link in the chain of evidence needed to prosecute the claimant for a . . . crime." *Id.* Although the Fifth Amendment only mentions criminal proceedings, the Supreme Court has held that the right "can be claimed in *any proceeding,* be it criminal or civil, administrative or judicial, investigatory or adjudicatory." *In re Gault,* 387 U.S. 1, 47, 87 S.Ct. 1428, 1454, 18 L.Ed.2d 527 (1967) (*quoting Murphy v. Waterfront Commission,* 378 U.S. 52, 94, 84 S.Ct. 1594, 1611, 12 L.Ed.2d 678 (1964) (White, J., concurring)).[7]

As a threshold matter, it is clear that the questions posed to Teresa at the several pertinent hearings in the Circuit Court, including the question posed at the 5 June 2002 hearing, all had the potential, if answered, to implicate her in the charged crime of kidnapping Ariel.[8] The Supreme Court has held that

---

7. In certain situations in certain civil proceedings in Maryland courts, such as when a party in a divorce case invokes the Fifth Amendment rather than answer a question regarding whether he or she committed adultery, there may be adverse consequences short of incarceration, such as the drawing of an adverse inference where the information sought is material to the proceedings. *See Robinson v. Robinson,* 328 Md. 507, 515–18, 615 A.2d 1190, 1194–96 (1992) (holding that invocation of Fifth Amendment in response to questions concerning adultery allowed court to take adverse inference in child custody matter).

8. Because the kidnapping statute, Md.Code (2002), § 3–502 of the Criminal Law Article, explicitly excludes situations in which a minor child is abducted by the child's parent, we presume that the Carroll County prosecutor charged Teresa under Md.Code (2002), § 3–503 of

to invoke the right against self-incrimination, "it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer ... might be dangerous because injurious disclosure could result." *Hoffman*, 341 U.S. at 486–87, 71 S.Ct. at 818, 95 L.Ed. 1118. Although it is not certain on this record who, if anyone, assisted Ariel in eloping from the foster home in Carroll County during the early morning hours of 9 January 2001, BCDSS and the State's Attorney's Office for Carroll County clearly believed that Teresa was responsible. At the time of the hearing on 3 August 2001 in the Circuit Court for Baltimore City, when Teresa was first questioned about her son, the trial judge was aware that she was wanted by Carroll County police on an arrest warrant issued as a result of her alleged involvement in Ariel's disappearance.

Because of the pending kidnapping charges, Teresa had "reasonable cause to apprehend danger from a direct answer" to the court's question concerning Ariel's whereabouts. *Hoffman*, 341 U.S. at 486, 71 S.Ct. at 818, 95 L.Ed. 1118. Questioning Teresa as to the location, or even the last known location, of Ariel possessed the potential for demonstrating her culpability in the alleged kidnapping. Although the juvenile court's primary objective was to determine Ariel's location for his safety, it was clear that his mother's statements not only could be used to locate the child, but also to gather evidence for law enforcement purposes as to how Ariel left the

---

the Criminal Law Article. Section 3–503 describes the crime of child kidnapping: "A person may not, without color of right:

(i) forcibly abduct, take, or carry away a child under the age of 12 years from:

1.   the home or usual place of abode of the child; or

2.   the custody and control of the child's parent or legal guardian;

(ii) without the consent of the child's parent or legal guardian, persuade or entice a child under the age of 12 years from:

1.   the child's home or usual place of abode; or

2.   the custody and control of the child's parent or legal guardian; or

(iii) with the intent of depriving the child's parent or legal guardian, or any person lawfully possessing the child, of the custody, care, and control of the child, knowingly secrete or harbor a child under the age of 12 years."

foster home. Such evidence could then be used to discover what role Teresa may have had in Ariel's disappearance.

Furthermore, the threat of prosecution was not hollow or speculative, but rather immediate and certain. *See Choi v. State*, 316 Md. 529, 536–37, 560 A.2d 1108, 1111–12 (1989). The Carroll County prosecutor, through the procurement of an arrest warrant, took affirmative steps to prosecute Teresa for kidnapping her son.[9] Even though her testimony was being compelled in a civil juvenile proceeding, Teresa was well aware that any information she provided to the juvenile court might be used against her in a subsequent criminal trial on the pending kidnapping charge in Carroll County. Her invocation of her Fifth Amendment right was justified.

## II.

BCDSS, however, argues that this Court should apply *Baltimore City Department of Social Services v. Bouknight*, 493 U.S. 549, 110 S.Ct. 900, 107 L.Ed.2d 992 (1990) to conclude that the Fifth Amendment does not apply to proceedings in which the location of a child found to be CINA is at issue. We find the reasoning in *Bouknight* to be inapplicable to the circumstances of the present case.

In *Bouknight*, a mother refused a court order to produce her child. *Id.* at 552, 110 S.Ct. at 903–04, 107 L.Ed.2d 992. The child had been declared a CINA, based on the mother's consistent physical abuse, and was placed under the oversight of BCDSS. *Id.* at 551–52, 110 S.Ct. at 903, 107 L.Ed.2d 992. Despite reservations, BCDSS agreed to allow the mother, Jacqueline Bouknight, to continue as the physical custodian of the child, subject to certain conditions placed upon her by a court-approved protective supervision order. *Id.* at 552, 110 S.Ct. at 903, 107 L.Ed.2d 992. When BCDSS later learned

9. Although the Carroll County prosecutor's theory is not clear in the record, the kidnapping charge was apparently based on the supposition that although Ariel may have left the foster home by his own will, he may have returned to his mother, and she had a duty to return him to foster care.

that Bouknight was violating the terms of the protective order, it petitioned the court to remove the child from Bouknight for placement in a foster home, which petition the court granted. *Id.* at 552–53, 110 S.Ct. at 903–04, 107 L.Ed.2d 992. Bouknight, however, refused to produce the child or reveal to BCDSS the location of the child. *Id.* at 553, 110 S.Ct. at 904, 107 L.Ed.2d 992. After several hearings at which Bouknight persisted in refusing to produce the child, the juvenile court found Bouknight in contempt and ordered that she be confined until she either produced the child or revealed his whereabouts. *Id.*

The Supreme Court held that the Fifth Amendment could not be invoked successfully to resist the order of the court to produce the child. *Id.* at 555, 110 S.Ct. at 905, 107 L.Ed.2d 992. Producing the child pursuant to a court order, the Court held, was not a sufficiently testimonial communication and therefore fell outside the boundaries of the Fifth Amendment's protections. *Id.* at 554–59, 110 S.Ct. at 905–07, 107 L.Ed.2d 992. Furthermore, the Court held that when an individual is subject to a non-criminal regulatory regime, such as a CINA juvenile proceeding, that individual may not rely on the Fifth Amendment to resist an order that furthers the objectives of the regulatory regime. *Id.* at 555–56, 110 S.Ct. at 905, 107 L.Ed.2d 992. Because Bouknight explicitly had consented to the conditions placed upon her by BCDSS at the time it approved her continuance as the physical custodian, the Court held that Bouknight was subject to the regulatory regime of the BCDSS and thus her ability to invoke the Fifth Amendment was reduced. *Id.* at 558, 110 S.Ct. at 906, 107 L.Ed.2d 992.

## A.

Although *Bouknight,* at first blush, may appear similar factually to the present case, its reasoning is not applicable to the present case. First, in the present case, the juvenile court's contempt order was not based on Teresa's failure to *produce* Ariel, but rather upon her failure to *testify* regarding her knowledge of his whereabouts, first couched in the present

tense and later framed in terms of the relatively near past. The Supreme Court long ago held that the Fifth Amendment is inapplicable to a court order requiring the production of documents or other tangible objects. *See Fisher,* 425 U.S. at 409, 96 S.Ct. at 1580–81, 48 L.Ed.2d 39 (holding that the disclosure of tax documents in the possession of an attorney did not violate the Fifth Amendment even though the documents contained potentially incriminating information). Although in very limited circumstances the act of production may be testimonial in nature and be afforded Fifth Amendment protection, *U.S. v. Doe,* 465 U.S. 605, 613, 104 S.Ct. 1237, 1242, 79 L.Ed.2d 552 (1984), the Supreme Court held that the custodian of an object may not withhold it "based upon the incrimination that may result from the contents or nature of the thing demanded." *Bouknight,* 493 U.S. at 555, 110 S.Ct. at 905, 107 L.Ed.2d 992. In *Bouknight,* the "object" demanded was a child, and the Court held that the act of producing that child was not a testimonial communication, but rather an act of production that fell outside the Fifth Amendment's protection. *Id.* at 554–59, 110 S.Ct. at 905–07, 107 L.Ed.2d 992.

Teresa, however, was not held in contempt for her failure to produce Ariel, but rather for her refusal to give a purely testimonial communication. At the time of the 5 June 2002 hearing, the juvenile court appeared satisfied that she may not be aware of the present whereabouts of Ariel due to the fact that she had been incarcerated for the previous ten months. Nonetheless, the court surmised that the circumstances of her last contact with Ariel might be of assistance to the authorities in determining his present location. Although Teresa may have been required to produce Ariel if he was within her control, compelling her to inform the court of the whereabouts of the subject of the production order is foreclosed by the Fifth Amendment, if properly asserted as here. *See U.S. v. Hubbell,* 530 U.S. 27, 34–35, 120 S.Ct. 2037, 2042, 147 L.Ed.2d 24 (2000) (holding that "there is a significant difference between the use of compulsion to extort communications from a defendant and compelling a person to engage in conduct that

may be incriminating"); *Curcio v. U.S.*, 354 U.S. 118, 123–24, 77 S.Ct. 1145, 1149, 1 L.Ed.2d 1225 (1957).

▇ In *Curcio*, the Supreme Court held that a custodian of corporate records could not be compelled to testify regarding the whereabouts of documents that the custodian was required to produce pursuant to a court order. 354 U.S. at 128, 77 S.Ct. at 1151–52, 1 L.Ed.2d 1225. Although the Fifth Amendment does not allow a custodian to withhold incriminating documents, the privilege does shield a custodian from being compelled to give incriminating testimony about the documents, including their location. *See id.* (stating that "forcing the custodian to testify orally as to the whereabouts of nonproduced records ... is contrary to the spirit and letter of the Fifth Amendment"). Therefore, even if Ariel was within Teresa's custody or control, the court could not overcome the proper assertion of her Fifth Amendment right and compel her to testify about the location of the child. Like the custodian in *Curcio*, Teresa could not be compelled, by threat of incarceration, to "condemn [herself] by [her] own oral testimony" in giving incriminating information relating to Ariel's whereabouts. *Id.* at 124, 77 S.Ct. at 1149, 1 L.Ed.2d 1225.

## B.

In *Bouknight*, the Supreme Court also concluded that because the mother consented to the conditions imposed by BCDSS on the retention of her physical custody of the child, Bouknight subjected herself to the "routine operation of the regulatory system" and therefore her ability to invoke the Fifth Amendment was reduced. 493 U.S. at 558, 110 S.Ct. at 906, 107 L.Ed.2d 992. In the present case, however, Teresa did not consent to the court's or BCDSS's jurisdiction over Ariel and never agreed to any terms that would allow her to retain any degree of lawful custody over Ariel. Teresa, unlike Bouknight, may not be said to have submitted to the regulatory regime of the BCDSS.

Nonetheless, BCDSS argues that *Bouknight* reaffirms and even extends the holding of *California v. Byers*, 402 U.S. 424,

91 S.Ct. 1535, 29 L.Ed.2d 9 (1971) that "the ability to invoke the [Fifth Amendment] privilege may be greatly diminished when invocation would interfere with the effective operation of a generally applicable, civil regulatory requirement." *Bouknight*, 493 U.S. at 557, 110 S.Ct. at 906, 107 L.Ed.2d 992. The compelled disclosures in *Bouknight* and *Byers*, however, are fundamentally different from those sought in the present case.

In *Byers*, the Supreme Court upheld a California statute that required drivers of motor vehicles involved in accidents to stop at the scene and provide their names and addresses. 402 U.S. at 434, 91 S.Ct. at 1541, 29 L.Ed.2d 9. The Court held that the requirements of the statute were part of a regulatory scheme that "was not intended to facilitate criminal convictions but to promote the satisfaction of civil liabilities arising from automobile accidents." *Id.* at 430, 91 S.Ct. at 1539, 29 L.Ed.2d 9. Conceding that it was possible that the act of stopping and revealing one's name and address at the scene of an accident could be incriminating, the Court nonetheless reasoned that the statute's requirements did not implicate the Fifth Amendment because the act of stopping was not a testimonial act[10] and that the disclosure of one's name and address was "an essentially neutral act." *Id.* at 431–32, 91 S.Ct. at 1539–40, 29 L.Ed.2d 9; *See also Hiibel v. Sixth Judicial Dist. Court,* —— U.S. ——, ——, 124 S.Ct. 2451, 2461, 159 L.Ed.2d 292 (2004) (upholding a regulatory statute requiring individuals, when asked to do so, to give their name to police officers based on reasoning that "[a]nswering a request to disclose a name is likely to be so insignificant in the scheme of things as to be incriminating only in unusual circumstances").

■ In the present case, it is quite clear that requiring Teresa to testify about her knowledge of Ariel's whereabouts

---

10. The Court explained that the act of stopping one's vehicle at the scene of an accident was less testimonial "than requiring a person in custody to stand or walk in a police lineup, to speak proscribed words, or to give samples of handwriting, fingerprints, or blood." *Byers,* 402 U.S. at 431–32, 91 S.Ct. at 1539–40, 29 L.Ed.2d 9 (citations omitted).

is completely testimonial and not "an essentially neutral act." *See Hubbell,* 530 U.S. at 37 n. 19, 120 S.Ct. at 2044 n. 19, 147 L.Ed.2d 24 (quoting *Doe v. U.S.,* 487 U.S. 201, 209, 108 S.Ct. 2341, 2347, 101 L.Ed.2d 184 (1988)) (stating that "in order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information"). The mere existence of a civil regulatory system may not trump the essence of the Fifth Amendment—to foreclose situations where individuals are compelled to give incriminating *testimony. Bouknight,* 493 U.S. at 561, 110 S.Ct. at 908, 107 L.Ed.2d 992. The Court in *Bouknight* held that a parent may not rely on the Fifth Amendment primarily because the act of producing a child, though potentially incriminating, was no different than the production of incriminating tax records or corporate documents. *Id.* at 559–61, 110 S.Ct. at 907–08, 107 L.Ed.2d 992. Although the *Bouknight* Court relied in its reasoning, to a degree, on the existence of a noncriminal regulatory regime, it held that the result would have been different had the juvenile court sought to compel incriminating testimony rather than the production of evidence, or in this case, the child. *Id.* at 561, 110 S.Ct. at 908, 107 L.Ed.2d 992 (stating that a noncriminal regulatory system "may neither compel incriminating testimony nor aid a criminal prosecution"). Furthermore, the reasoning in *Byers* was not based on the incriminating nature of the motorist's statements, but rather on the rationale that the disclosures required by the statute were not testimonial nor inherently incriminating and, therefore, did not fall within the protective penumbra of the Fifth Amendment. 402 U.S. at 431–32, 91 S.Ct. at 1539–40, 29 L.Ed.2d 9.

The primary distinction between *Bouknight* and *Byers* on the one hand and the present case is that the compelled statement sought from Teresa meets the threshold test for a situation where the Fifth Amendment may be invoked properly, namely, the information sought was compelled, testimonial in nature, and bore a sufficient likelihood of being incriminating. Furthermore, Teresa did not subject herself voluntarily to the regulatory scheme of the BCDSS, and she obviously

feared the potential use of her responses in the pending criminal proceeding. *Bouknight* counsels us that the Fifth Amendment retains its vigor, despite the existence of a regulatory regime, when the compelled disclosures are of the type normally covered by the Fifth Amendment. 493 U.S. at 561, 110 S.Ct. at 908, 107 L.Ed.2d 992. At most, the existence of a regulatory regime acts to narrow the applicability of the Fifth Amendment. Nonetheless, when the operation of a regulatory regime demands testimony that may be incriminating, the Fifth Amendment may be invoked.

## III.

Although we conclude that Teresa was entitled to refuse to answer the inquiries of the court, our holding does not carry with it any blessing of Teresa's role, if any, in spiriting Ariel from foster care. When a child is taken properly into State custody to prevent further abuse, it is imperative that the State do all within its power to ensure that the child is provided with a safe and healthy environment. *See Bouknight*, 493 U.S. at 559, 110 S.Ct. at 907, 107 L.Ed.2d 992 (stating that once the child is "adjudicated a [CINA], his care and safety [become] the particular object of the State's regulatory interests"). By fleeing with Ariel, if she did, Teresa denied the State the opportunity to provide the child with proper medical treatment, and in turn she, at the least, may have denied Ariel his right to be healthy and to receive a proper education.

The State argues that the "societal interest in protecting children transcends the Fifth Amendment privilege against self-incrimination and cannot be a barrier to compelling the disclosure of information necessary to protect human life." Viscerally and emotionally, this is an argument of some persuasive force. Although it is true that the interest in protecting children, especially children in the custody of the State, is an extremely important interest, however, such an interest does not justify abandonment of our constitutional

foundations. *See In re Gault,* 387 U.S. at 47, 87 S.Ct. at 1454, 18 L.Ed.2d 527 (stating that the "language of the Fifth Amendment . . . is unequivocal and without exception. And the scope of the privilege is comprehensive."). The availability of the right against self-incrimination depends not on what is at stake for the courts or society at large, but what is at stake for the potential defendant. Therefore, when a court demands incriminating testimony, the subject matter or type of proceeding, whether it be juvenile or criminal, does not diminish the force and applicability of the right against self-incrimination. *Id.*

Several other courts have addressed whether the assertion of the right against self-incrimination should be balanced against the State's interest in protecting abused or missing children. *See, e.g., In re J.A.,* 166 Vt. 625, 699 A.2d 30, 31 (1997); *In re Welfare of J.W.,* 415 N.W.2d 879, 882–83 (Minn. 1987); *In re Amanda W.,* 124 Ohio App.3d 136, 705 N.E.2d 724, 727–28 (1997). These cases demonstrate that while the courts must make every effort to protect the interests of children, they must do so within constitutional limits. For example, *In re Welfare of J.W.* concerned whether the State could deny custody to a couple of their children based on the couple's refusal, grounded in the Fifth Amendment, to engage in court-ordered therapy that would require them to make incriminating admissions about the abuse of a nephew. 415 N.W.2d at 883. The Minnesota Supreme Court held that the State could not compel therapy treatment that would require the couple, by their own words, to incriminate themselves. *Id.* at 883. Although the court made special effort to consider the best interests of the children, it ultimately held that the ability to assert a constitutional right should not yield to the fulfillment of a course of action that may be in the best interests of a child. *Id.* at 883–84.

Likewise, the State here may not rely on a "best interests of Ariel" argument to compel Teresa to incriminate herself. She was not offered or granted use immunity for her role, if any,

in Ariel's disappearance on 5 June 2002.[11]   Once a recalcitrant parent is granted use immunity, the threat of using his or her statement against that person is lifted and the parent must testify or face contempt of court charges.   The court may then punish a parent who refuses to testify without offending the constitutional guarantees of the Fifth Amendment.   *See Kastigar v. U.S.*, 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212 (1972) (stating that "immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege").   In doing so, the court balances its interest in prosecuting unlawful conduct and providing for the welfare of abused and missing children, all while respecting the accused's constitutional rights.

All that the Fifth Amendment requires is that a criminal defendant not be forced to give testimony that could be used to incriminate himself or herself.   The State is free to pursue kidnapping charges against Teresa, but it must do its own homework.   The State may not force Teresa to condemn herself any more than the State may force the common thief to be a witness against himself or herself.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.   COSTS TO BE PAID BY PETITIONER.

---

11.   Md.Code (1973, 2002 Repl.Vol.), § 9–123 of the Courts and Judicial Proceedings Article allows a prosecutor to seek a grant of use immunity from the court when the testimony of a witness may be necessary to the public interest or the prosecutor anticipates that the witness will invoke the Fifth Amendment.