(157 P.3d 655)
No. 96,862

STATE OF KANSAS, *Appellant*, v. CHRISTOPHER L. BROWN, *Appellee*.

Opinion filed May 4, 2007.

*Jamie L. Karasek*, assistant district attorney, *Robert D. Hecht*, district attorney, and *Phill Kline*, attorney general, for appellant.

*Jennifer C. Roth,* assistant public defender, for appellee.

Before RULON, C.J., GREENE, J., and LARSON, S.J.

GREENE, J.: In this interlocutory appeal, the State appeals the district court's decision to suppress the defendant's statements to law enforcement officers confessing his involvement in causing injuries to his 1-month-old baby because the statements were not freely and voluntarily made. The State contends the statements were voluntary and should not be suppressed. Concluding that the district court's decision is supported by substantial competent evidence, we affirm.

*Factual and Procedural Background*

On December 11, 2002, Brown's baby was taken to a Topeka area hospital with a skull fracture, a subdural hematoma, a lacerated liver, and fractured ribs. When questioned about the injuries, Brown stated he found the baby with a 3-year-old brother on the floor beside the crib. The baby's injuries, however, were not consistent with this explanation, and an investigation was initiated. On December 20, 2002, the Kansas Department of Social and Rehabilitation Services (SRS) completed its investigation, finding that the Browns were *"substantiated* as . . . perpetrator[s]" of child abuse. All three children were removed from the Brown home.

Throughout the child in need of care (CINC) proceedings, the Browns maintained their innocence. Because of this perceived conspiracy to withhold the truth about the baby's injuries, SRS did not recommend reintegration and persistently pressured the Browns to "admit how the injuries to the children were sustained." Finally, on the date the Browns' parental rights were to be relinquished, Brown went to the sheriff's office, sought out a detective who had been involved in the investigation, and told him he was ready to make a statement. After being *Mirandized,* Brown gave a statement admitting that on the night in question, the baby would not stop crying, was driving him "freaking crazy," and Brown "squeezed him too hard."

Brown was then charged with aggravated battery and abuse of a child. Before trial, the court held a partial *Jackson v. Denno,* 378

U.S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1974 (1964), hearing to determine whether the confession was voluntary. The district court initially ruled the confession admissible; but on reconsideration and after review of the records of the CINC proceedings, the court found that "the circumstances under which the . . . statement was given violated the Fifth Amendment [to] the United States Constitution and . . . was not freely and voluntarily given." The State appeals pursuant to K.S.A. 22-3603.

*Standard of Review*

To determine whether a defendant's confession is voluntary, a court must consider the totality of the circumstances. The prosecution bears the burden of proving that a confession is admissible by a preponderance of the evidence. Factors include the duration and manner of the interrogation; the accused's ability on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation. The essential inquiry is whether the statement was the product of the accused's free and independent will. *State v. Swanigan*, 279 Kan. 18, 23-24, 106 P.3d 39 (2005).

A dual standard is used when reviewing the suppression of a confession. The appellate court reviews the factual underpinnings of the decision under a substantial competent evidence standard and reviews the ultimate legal conclusion drawn from those facts de novo. The appellate court does not reweigh evidence, assess the credibility of the witnesses, or resolve conflicting evidence. *State v. Ackward*, 281 Kan. 2, 8, 128 P.3d 382 (2006).

*Did the District Court Err in Suppressing Brown's Confession?*

The State argues that the procedure followed by law enforcement prior to Brown's statements "could not be characterized as coercion or trickery," that Brown received the requisite *Miranda* warnings, and that he knowingly and voluntarily waived his rights. The State emphasizes that Brown voluntarily sought out law enforcement and repeatedly told them "he was talking to officers because he could no longer go on lying about what happened."

Because the district court properly based its decision on the totality of the circumstances, we focus not only on these circumstances immediately preceding the statement, but also on the pressure applied throughout the CINC proceedings. Between May 2003 and October 2004, the CINC record is replete in stating that reintegration would not be considered unless the parents "admit" the cause of injuries to the children. For example, in a letter to the CINC judge and copied to the Browns, SRS stated:

"The parents *need to admit* how the injuries to the children were sustained, even if it is through the therapist, before reintegration is a viable option. Only after the parents make an admission of how the multiple injuries were inflicted upon the twins will reintegration be pursued." (Emphasis added.)

The case plan included a requirement that Browns "will admit how injuries were sustained to children." During the CINC proceedings, a case worker wrote a report to the CINC judge stating:

"Therefore, even though [Browns] have completed all the reintegration tasks but one, that one is critical to considering them as being able to safely parent these children. Simply stated, they have been asked to 'tell what really happened' to [the baby] so appropriate follow-up could occur. They have repeatedly stated that *even though they did nothing wrong, [Brown] would 'admit he did it' just to get the kids back."* (Emphasis added.)

Ultimately, SRS recommended adoption of the children because the "task" of admitting how the injuries were sustained "has not been done." A trial for termination of parental rights was set, and on the day of trial, after arriving at the courthouse and during a delay because the CINC judge was running late, Brown got up from his seat and proceeded to the sheriff's office to make his statement. According to Brown, the CINC proceedings and their potential outcome played a role in his decision. His testimony at the *Jackson v. Denno* hearing included the following:

"[B]ecause for two, two and a half years we were told, you know, you do these things that we are asking of you and we'll be able to rehabilitate you and give you your kids back. And what the multidisciplinary team came down with was is they needed to know who caused the injuries, so every one at the case plan and in court they said no one can have the kids back unless we know who did it, or until there was an admission of guilt of how the injuries happened.

. . . .

"[i]f somebody admits to it that maybe my wife and—she would be able to have the kids and her rights or, you know, they would leave my wife and my family alone."

Brown argues on appeal that these proceedings coerced his statement. His brief on appeal articulates the argument as follows:

"Mr. Brown's statement was not voluntary because it was the product of coercion from multiple state actors: the CINC court, agents of SRS (a state agency), and agents of Kansas Children's Service League and Kaw Valley Behavioral Health Care (who contract with the state to provide foster care services) all told Mr. Brown repeatedly for over two years that until someone admitted to these injuries, he and his wife could not have their children back. It did not matter if [the Browns] complied with every other requirement—nothing would happen with their children returning home until someone admitted to these injuries. Mr. Brown's will was overborne by the undisputed actions of state actors in positions of power over Mr. Brown ever being able to have custody of his children again."

After focusing on these aspects of the record, we conclude there is substantial competent evidence that the thought of losing his parental rights was likely a material factor in Brown's decision to make his statement. The factual underpinnings of the district court's decision to suppress the statements are adequately supported by the record.

We thus turn to the legal sufficiency of these circumstances to support suppression of Brown's confession. The district judge cited and relied in part on two CINC cases from Ohio and Vermont.

"[U]ltimately, I think these cases that defendant brought this morning I think do raise an issue as to whether this whole proceeding did not put Mr. Brown in a situation that he was being required to admit criminal misconduct in order to reunite the family and that's one of the statements out of *In re J.A., Juvenile*, out of the state of Vermont, 699 A.2d 30. We have held, and in a prior case the court had held that the trial court cannot specifically require the parents to admit criminal misconduct in order to reunite the family. I think it's pretty clear that it doesn't matter what type of proceeding, and I think perhaps [the State] is conceding that these cases, although they arise in the course of a child in need of care proceedings in some other states, and obviously they are not direct precedent for this state, I think the Constitutional issues are not just unique to one state or another. We have those Constitutional issues through, and there was a statement in one of the cases, *In re Amanda W.*, [124 Ohio App. 3d 136] the type of proceeding does not determine the availability of the privilege, rather it turns upon whether the statement or admission is or may be inculpatory.

"Furthermore, the court in that same case, *In re Amanda W.*, states, moreover, an implicit and potent penalty for failure to satisfy the requirements of a particular case plan is a loss of a parents' fundamental liberty right to the care, custody, and management of his or her child. And the court further states, '[i]n our opinion, this is the type of compelling sanction that forces, forces an individual to admit to offenses in violation of his right not to incriminate himself.' "

These authorities, *In re Amanda W.*, 124 Ohio App. 3d 136, 705 N.E.2d 724 (1997), and *In re J.A.*, 166 Vt. 625, 699 A.2d 30 (1997), indeed hold that requiring an admission of abuse as a condition of reunification of one's family violates a person's rights under the Fifth Amendment to the United States Constitution. Other authorities are in accord. See, *e.g.*, *In re Ariel G.*, 383 Md. 240, 858 A.2d 1007 (2004). The State argues that these authorities are distinguishable because they are not criminal prosecutions. Although we appreciate this distinction, we agree with the district court in concluding that the type of procedural context is irrelevant to the constitutional right that is at stake. As stated by the Ohio court, "[t]he privilege to refrain from compulsory self-incrimination as guaranteed by the Fifth Amendment to the Constitution of the United States ' "can be claimed in any proceeding, be it criminal or civil, administrative or adjudicatory . . . ." ' [Citations omitted.]" 124 Ohio App. 3d at 140.

Moreover, the underlying principle that the voluntariness of one's statements to law enforcement can be undermined when solicited under threat of another coercive option has been endorsed in criminal proceedings. See, *e.g.*, *Garrity v. New Jersey*, 385 U.S. 493, 17 L. Ed. 2d 562, 87 S. Ct. 616 (1967) (officers under investigation told that refusal to answer questions could result in removal from office); *Lynumn v. Illinois*, 372 U.S. 528, 9 L. Ed. 2d 922, 83 S. Ct. 917 (1963) (confession solicited by threat of taking children away); *United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981) (confession solicited by threat of not seeing children "for a while"); *State v. Mzhickteno*, 8 Kan. App. 2d 389, 658 P.2d 1052 (1983) (confession procured under threat of being fired).

When a parent is essentially compelled to choose between confessing guilt in abusing his or her own child or losing his or her parental rights, the choice is between two fundamental rights un-

der the Constitution. As noted above, the privilege to refrain from compulsory self-incrimination is guaranteed by the United States Constitution. *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, *reh. denied* 385 U.S. 890 (1966). The right of parents to make decisions concerning the care, custody, and control of their own children is considered a fundamental right and is protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 66, 147 L. Ed. 2d 49, 120 S. Ct. 2054 (2000); *In re Creach*, 37 Kan. App. 2d 613, 155 P.3d 719 (2007). Clearly, it was entirely appropriate for the district court to consider the pressure placed on Brown by the CINC proceedings in considering the totality of the circumstances surrounding his confession. See *Swanigan*, 279 Kan. at 36-37. We think this was especially important here, given the assessment of SRS that Brown may have been predisposed to falsify an admission of his guilt "just to get the kids back."

Having been subjected to persistent pressure from SRS and the CINC proceedings, and faced with the inevitable loss of his parental rights, Brown succumbed and made a confession that would subject himself to a criminal prosecution. Notwithstanding his stated motivations and his being given *Miranda* rights at the time of the statement, we decline to second-guess the district court, which determined from the totality of the circumstances that Brown's statement was not freely and voluntarily made.

The State argues the police "did nothing wrong" after Brown arrived at the station and made his statements and that our focus should be limited to these circumstances. We believe, however, that such a limited focus of the inquiry could provide unlawful safe harbor to coercive conduct prior to the precise moment of the statement. For example, would the Constitution permit admission of a statement resulting from a post-*Miranda* encounter when the encounter itself was provoked by a psychologist employed by a state agency for the purpose of provoking a confession? We believe that established precedent in Kansas and in the federal courts compels an examination of the totality of the circumstances, and such an inquiry must not be limited strictly to behavior *immediately* prior to a suspect's statement but rather should focus on any and all

aspects of the circumstances that may have bearing on whether the suspect's will was overborne when the statement was made. See *Swanigan*, 279 Kan. at 23-24. As stated by the United States Supreme Court:

"We think its clear that a confession made under such circumstances must be deemed not voluntary, but coerced. That is the teaching of our cases. We have said that the question in each case is whether the defendant's will was overborne at the time he confessed. [Citations omitted]. If so, the confession cannot be deemed 'the product of a rational intellect and a free will.' [Citations omitted]." *Lynumn*, 372 U.S. at 534.

Affirmed.