No. 96,862

STATE OF KANSAS, *Appellant*, v. CHRISTOPHER L. BROWN, *Appellee.*

(182 P.3d 1205)

Opinion filed May 16, 2008.

*Robert D. Hecht*, district attorney, argued the cause, and *Jamie L. Karasek*, assistant district attorney, and *Phill Kline*, attorney general, were with him on the briefs for the appellant.

*Jennifer C. Roth*, of Third Judicial District Public Defender Office, argued the cause and was on the briefs for the appellee.

The opinion of the court was delivered by

ROSEN, J.: This case comes before us on the State's petition for review of the Court of Appeals decision in *State v. Brown*, 37 Kan. App. 2d 726, 157 P.3d 655 (2007). The State sought interlocutory review of a district court decision suppressing Brown's statements to law enforcement officers, in which he confessed his involvement in injuring his 1-month-old child, because the statements were not freely and voluntarily made. The Court of Appeals affirmed the decision of the district court.

The Court of Appeals set out the underlying facts as follows:

"On December 11, 2002, Brown's baby was taken to a Topeka area hospital with a skull fracture, a subdural hematoma, a lacerated liver, and fractured ribs. When questioned about the injuries, Brown stated he found the baby with a 3-year-old brother on the floor beside the crib. The baby's injuries, however, were not consistent with this explanation, and an investigation was initiated. On December 20, 2002, the Kansas Department of Social and Rehabilitation Services (SRS) completed its investigation, finding that the Browns were '*substantiated* as . . . perpetrator[s]' of child abuse. All three children were removed from the Brown home.

"Throughout the child in need of care (CINC) proceedings, the Browns maintained their innocence. Because of this perceived conspiracy to withhold the truth about the baby's injuries, SRS did not recommend reintegration and persistently pressured the Browns to 'admit how the injuries to the children were sustained.' Finally, on the date the Browns' parental rights were to be relinquished, Brown went to the sheriff's office, sought out a detective who had been involved in the investigation, and told him he was ready to make a statement. After being *Mirandized*, Brown gave a statement admitting that on the night in question, the baby

would not stop crying, was driving him 'freaking crazy,' and Brown 'squeezed him too hard.'

"Brown was then charged with aggravated battery and abuse of a child. Before trial, the court held a partial *Jackson v. Denno*, 378 U.S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774 (1964), hearing to determine whether the confession was voluntary. The district court initially ruled the confession admissible; but on reconsideration and after review of the records of the CINC proceedings, the court found that 'the circumstances under which the . . . statement was given violated the Fifth Amendment [to] the United States Constitution and . . . was not freely and voluntarily given.' "

## Standard of Review

Appellate courts apply a dual standard when reviewing the suppression of a confession. In reviewing a trial court's ruling on a motion to suppress a confession, the appellate court reviews the factual underpinnings of the decision under a substantial competent evidence standard. The ultimate legal conclusion drawn from those facts is reviewed de novo. The appellate court does not reweigh evidence, assess the credibility of the witnesses, or resolve conflicting evidence. *State v. Ackward*, 281 Kan. 2, 8, 128 P.3d 382 (2006).

When a defendant claims his or her confession was not voluntary, the prosecution has the burden of proving by a preponderance of the evidence that it was voluntary. The essential inquiry is whether the statement was the product of the accused's free and independent will. The court looks at the totality of the circumstances surrounding the confession and determines its voluntariness. *State v. Walker*, 283 Kan. 587, 596-97, 153 P.3d 1257 (2007).

## Did The District Court Erroneously Suppress Brown's Confession?

The district court found Brown did not freely and voluntarily give his confession. The district court emphasized the pressure that SRS had placed on Brown to admit to having a role in his child's injuries. The State contends on review that only police conduct can constitute coercive influence to obtain a confession; conduct by another state entity, such as SRS, is not prohibited by the Constitution.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal

case to be a witness against himself." This privilege against self-incrimination is made applicable to the states through the Fourteenth Amendment Due Process Clause. *Malloy v. Hogan*, 378 U.S. 1, 6, 12 L. Ed. 2d 653, 84 S. Ct. 1489 (1964). *Malloy* instructs that the government is "constitutionally compelled to establish guilt by evidence independently and freely secured, and may not by coercion prove a charge against an accused out of his own mouth." 378 U.S. at 8. The privilege guarantees "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." 378 U.S. at 8.

The privilege may be raised in any proceeding, civil or criminal, formal or informal, where testimonial evidence may incriminate the individual in future criminal proceedings. *Lefkowitz v. Turley*, 414 U.S. 70, 77, 38 L. Ed. 2d 274, 94 S. Ct. 316 (1973). In *Hoffa v. United States*, 385 U.S. 293, 304, 17 L. Ed. 2d 374, 87 S. Ct. 408 (1966), *reh. denied* 386 U.S. 940 (1967), the Supreme Court held that compulsion is a necessary element of compulsory self-incrimination. A presumption of compulsion exists when a person is subjected to custodial interrogation, *State v. Hebert*, 277 Kan. 61, 71, 82 P.3d 470 (2004), and compulsion exists when a person is ordered to produce incriminating evidence, *Baltimore Dept. of Social Servs. v. Bouknight*, 493 U.S. 549, 554-55, 107 L. Ed. 2d 992, 110 S. Ct. 900 (1990), or threatened with serious penalties if the evidence is not produced, *Minnesota v. Murphy*, 465 U.S. 420, 434-35, 79 L. Ed. 2d 409, 104 S. Ct. 1136, *reh. denied* 466 U.S. 945 (1984).

The State cites language in *Colorado v. Connelly*, 479 U.S. 157, 170, 93 L. Ed. 2d 473, 107 S. Ct. 515 (1986), for the principle that the voluntariness of a confession depends on the absence of police overreaching. In *Connelly*, the Court held that coercive police activity is necessary for finding that a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment. 479 U.S. at 167. "The voluntariness of a waiver of [the Fifth Amendment] privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." 479 U.S. at 170.

It would require a very narrow interpretation for us to find that *Connelly* requires that only *police* conduct is relevant to determine whether a confession was voluntary. No other "State actors" were involved in the *Connelly* confession. Moreover, when discussing due process considerations, *Connelly* reiterated that there must be a link between the coercive activity of the State and the defendant's resulting confession. 479 U.S. at 165.

Regarding the Fifth Amendment, the *Connelly* Court explained:

"The sole concern of the Fifth Amendment, on which *Miranda* was based, is *governmental* coercion. See *United States v. Washington*, 431 U.S. 181, 187 (1977); *Miranda, supra*, 384 U.S., at 460. Indeed, the Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than *official* coercion.' *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)." (Emphasis added.) 479 U.S. at 170.

The State also cites *Haynes v. Washington*, 373 U.S. 503, 10 L. Ed. 2d 513, 83 S. Ct. 1336 (1963), which involved only conduct by police. The *Haynes* Court held that " 'the true test of admissibility is that the confession is made freely, voluntarily, and without compulsion or inducement *of any sort*.' " (Emphasis added.) 373 U.S. at 513 (quoting *Wilson v. United States*, 162 U.S. 613, 623, 40 L. Ed. 1090, 16 S. Ct. 895 [1896]).

The State cites as additional authority for the argument that coercive State conduct is limited to conduct by the police in the case of *Hutto v. Ross*, 429 U.S. 28, 30, 50 L. Ed. 2d 194, 97 S. Ct. 202 (1976). In *Hutto*, without mentioning law enforcement, the Supreme Court set forth the following test for voluntariness:

"The test is whether the confession was ' "extracted by *any sort of threats* or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." ' *Bram v. United States*, 168 U.S. 532, 542-543 (1897); see *Brady v. United States, supra*, [397 U.S.] at 753. . . . The confession [in the instant case] thus does not appear to have been the result of ' "any direct or implied promises" ' or any coercion on the part of the *prosecution*, and was not involuntary. *Bram v. United States, supra*, [168 U.S.] at 542-543." (Emphasis added.) 429 U.S. at 30.

The cases cited by the State do not persuade us that coercive conduct must be induced by law enforcement before it violates the Fifth Amendment. The Fifth Amendment is violated "when a State

compels testimony by threatening to inflict potent sanctions unless the constitutional privilege is surrendered." *Lefkowitz v. Cunningham*, 431 U.S. 801, 805, 53 L. Ed. 2d 1, 97 S. Ct. 2132 (1977) (threat of loss of public contracts may constitute coercive State conduct).

The general rule is that an individual must affirmatively assert his or her right against self-incrimination or else the law will consider the individual to have waived the right. *Murphy*, 465 U.S. at 429. Some exceptions to this general rule exist, and there are situations where the right against self-incrimination is "self-executing." *Murphy*, 465 U.S. at 429-34. In such situations, the constitutional privilege against self-incrimination may be asserted at a later time to suppress the statements made under State compulsion. See *State v. Evans*, 144 Ohio App. 3d 539, 550-51, 760 N.E.2d 909 (2001).

The State argues that the Court of Appeals failed to recognize that the privilege was not self-executing in the present case. The privilege against self-incrimination becomes self-executing for a defendant in a "classic penalty" situation.

*Murphy* involved a probationer's challenge to the condition of his probation, which required that the probationer be truthful with his probation officer. If the probationer did not comply, he faced revocation. The probationer claimed that this condition forced him to make incriminating statements and thereby infringed on his constitutional privilege against self-incrimination. The Supreme Court commented on the classic penalty situation and whether it applied in the probationer's case:

"In each of the so-called 'penalty' cases, the State not only compelled an individual to appear and testify, but also sought to induce him to forgo the Fifth Amendment privilege by threatening to impose economic or other sanctions 'capable of forcing the self-incrimination which the Amendment forbids.' *Lefkowitz v. Cunningham*, 431 U.S. 801, 806 (1977). . . . Occasionally . . . an individual succumbed to the pressure placed upon him, failed to assert the privilege, and disclosed incriminating information, which the State later sought to use against him in a criminal prosecution. *Garrity v. New Jersey*, 385 U.S. 493 (1967), was such a case, and the Court held that an individual threatened with discharge from employment for exercising the privilege had not waived it by responding to questions rather than standing on his right to remain silent. *Id.*, at 498-499.

"The threat of punishment for reliance on the privilege distinguishes cases of this sort from the ordinary case in which a witness is merely required to appear and give testimony. A State may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege. The result may be different if the questions put to the probationer, however relevant to his probationary status, call for answers that would incriminate him in a pending or later criminal prosecution. There is thus a substantial basis in our cases for concluding that if the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." *Murphy*, 465 U.S. at 434-35.

The question before us is whether Brown was faced with the type of penalty that was capable of coercing incriminating testimony. Justice O'Connor's concurring opinion in *McKune v. Lile*, 536 U.S. 24, 153 L. Ed. 2d 47, 122 S. Ct. 2017 (2002), reviewed cases where the penalties rose to the level capable of coercing testimony. Three of the penalty cases "involved the potential loss of one's livelihood, either through the loss of employment, loss of a professional license essential to employment, or loss of business through government contracts." 536 U.S. at 50 (O'Connor, J., concurring). The penalty faced in *Lefkowitz*, 431 U.S at 807-08, was the loss of the right to participate in political associations and to hold public offices. This choice implicated the First Amendment right to run for office and to participate in political associations, which were grave consequences. *McKune*, 536 U.S. at 50 (O'Connor, J., concurring).

The Court of Appeals found in the present case that "[w]hen a parent is essentially compelled to choose between confessing guilt in abusing his or her own child or losing his or her parental rights, the choice is between two fundamental rights under the Constitution." 37 Kan. App. 2d at 731-32. In other words, Brown would suffer a substantial penalty, the loss of the fundamental liberty interest in the care, custody, and control of his children, if he elected not to incriminate himself, thereby violating the terms of the case plan.

The State argues that Brown was not asked to choose between his children and the exercise of his privilege against self-incrimination, asserting that it was only a recommendation that he provide an explanation for his child's injuries that was consistent with the medical findings, and Brown was not required to admit he abused the infant.

The State did not, however, submit any evidence to refute what Brown told the district court. Brown testified at the *Jackson v. Denno* hearing that he was told that he could regain custody of his children if he completed certain tasks. He testified that he made the confession because the case plan and the court said that the parents could not get the children back until SRS knew how the injuries occurred. A social worker testified by deposition that the task that the parents needed to admit how the injuries occurred was added to the case plan and had not been completed. Brown went to the courthouse on the day of the confession in order to relinquish his parental rights in an attempt to ensure that the maternal grandparents would be able to adopt the children.

An excerpt from the case plan for the time from May 20, 2003, to November 16, 2003, shows the task: "Chris and/or Michelle will admit how injuries were sustained to children." A termination of parental rights motion was filed on January 16, 2004, and one of the factual bases listed was that the parents allowed the children to be harmed and could not or would not provide a reasonable explanation for the injuries. A permanency-objectives form listed a target date of August 16, 2004, for the parents to admit how the injuries were sustained to the children, showing that the task continued to be required after the termination motion was filed. Kansas Children's Services League reports informed the district court that the agency could not assure the safety of the children in the parents' home until the cause of the injuries was made known.

The pretrial conference for the termination proceedings was set for January 5, 2005, and the trial was set for March 29, 2005. The records from the child in need of care (CINC) proceedings did not show any additional problems in the family. The caseworker's deposition confirmed there were no problems such as drug abuse or

other issues of a major concern outside of the parents' inability to provide a reasonable explanation for the injuries.

These facts show that Brown was placed in a "classic penalty" situation. Although SRS may not have been motivated to obtain an admission of abuse because it planned to ensure a criminal prosecution, the penalty that Brown faced if he did not make a statement to SRS was the type of penalty capable of coercing incriminating testimony from him. His failure to invoke his constitutional privilege against self-incrimination is therefore excused, and the privilege became self-executing under the facts of this case.

Because Brown made an incriminating statement that the State seeks to use against him at a criminal trial, the next issue for us to consider is whether governmental coercion rendered the confession involuntary.

In *Arizona v. Fulminante*, 499 U.S. 279, 285-86, 113 L. Ed. 2d 302, 111 S. Ct. 1246 (1991), the Supreme Court agreed with the lower court's application of a totality of circumstances test to determine the voluntariness of a confession. Our Court of Appeals was correct when it found that the district court properly based its decision on the totality of the circumstances and in considering the pressure from State actors to make an incriminating statement. 37 Kan. App. 2d 728.

In the present case, the same facts demonstrating that Brown faced a substantial penalty support the district court's finding that, under the circumstances, Brown's will was overcome by State actors. When Brown came forward with the evidence of governmental coercion, the State presented no evidence to dispute his assertions. The State had the burden to prove by the preponderance of the evidence that the confession was voluntary when the district court permitted the defense to amend the motion to reconsider by adding the Fifth Amendment issue. Because the district court properly found that the confession was coerced under the totality of the circumstances, the automatic, self-executing exclusionary rule of the Fifth Amendment applies.

The district court and the Court of Appeals also relied on two cases from other jurisdictions, *In re Amanda W.*, 124 Ohio App. 3d 136, 705 N.E.2d 724 (1997), and *In re J.A.*, 166 Vt. 625, 699

A.2d 30 (1997), as authority showing that requiring an admission of abuse as a condition of reunification of one's family violates a person's Fifth Amendment rights.

In *Amanda W.*, the parents argued that a case plan requiring a parent to admit to sexually abusing his child in order to be reunited with that child violated the Fifth Amendment. The Ohio Court of Appeals agreed, finding a stepfather's admission to sexual abuse made in order to attend required group counseling for sex offenders would provide the basis for his criminal prosecution and the mother's statements concerning the stepfather's culpability would create the potential for criminal charges against her for child endangerment. 124 Ohio App. 3d at 140-41. The Ohio court found that "an implicit, and potent, penalty for failure to satisfy the requirements of a particular case plan is the loss of a parent's fundamental liberty right to the care, custody, and management of his or her child." 124 Ohio App. 3d at 141. The court held that the privilege against self-incrimination therefore became self-executing. 124 Ohio App. 3d at 141.

In *J.A.*, the Vermont Supreme Court held that a trial court cannot specially require parents to admit criminal misconduct in order to reunite the family because such a requirement violates the Fifth Amendment right against self-incrimination. 166 Vt. at 625-26; see also *In re Ariel G.*, 383 Md. 240, 245-47, 858 A.2d 1007 (2004) (finding that mother was entitled under the privilege to refuse to answer civil juvenile court's inquiries about the location of her son).

The State argues that the courts' reliance on these cases is misplaced because they do not involve criminal prosecutions and because Brown was not specifically required to admit to abusing the children. As discussed earlier, Brown was compelled to make self-incriminating statements under the penalty of losing his fundamental right to his children. Furthermore, the Court of Appeals was correct in holding that the particular procedural context is irrelevant to the constitutional right that is at stake. 37 Kan. App. 2d at 731. The privilege can be claimed in any type of proceeding, but it only protects the individual from self-incrimination in criminal prosecutions. If the individual is granted immunity from criminal prosecution, he or she may therefore be compelled by govern-

ment officials to testify in a noncriminal or criminal setting. See *In re Ariel G.*, 383 Md. at 255 ("Once a recalcitrant parent is granted use immunity, the threat of using his or her statement against that person is lifted and the parent must testify or face contempt of court charges.").

The State also argues that the Court of Appeals improperly relied on cases in which the purpose of the interrogations was to aid law enforcement in preparing a criminal case. The State distinguishes the present case because the admissions that the State was seeking were aimed at protecting children from abuse and neglect and were not aimed at preparing a criminal case against the defendant. The argument follows that the purpose in trying to get the information from the Browns was constructive so that recommendations could be made to ensure the parents would be able to safely parent their children.

It appears the State seeks to balance its interest in protecting the welfare of children against a parent's constitutional privilege against self-incrimination. The United States Supreme Court, however, has rejected such a balancing of interests when dealing with the privilege against self-incrimination "in its pristine form." *New Jersey v. Portash*, 440 U.S. 450, 459, 59 L. Ed. 2d 501, 99 S. Ct. 1292 (1979) ("Balancing . . . is not simply unnecessary. It is impermissible.").

We are not called upon in this case to set out rules governing how social service agencies should conduct CINC investigations or treatment plans other than to state that such CINC proceedings based on those investigations and/or intervention plans must remain within constitutional limits. The decisions of other appellate courts may, however, provide some guidance. The Nebraska Court of Appeals observed:

"A review of the authority in other states indicates that there is a very fine, although very important, distinction between terminating parental rights based specifically upon a refusal to waive protections against self-incrimination and terminating parental rights based upon a parent's failure to comply with an order to obtain meaningful therapy or rehabilitation, perhaps in part because a parent's failure to acknowledge past wrongdoing inhibits meaningful therapy. The latter is constitutionally permissible; the former is not. See, *Mullin v. Phelps*, [162 Vt. 250,] 647 A.2d 714 (1994); *Matter of Welfare of J.G.W.*, 433 N.W.2d 885 (Minn. 1989);

*Matter of Welfare of J.W.*, 415 N.W.2d 879 (Minn. 1987)." *In re Interest of Clifford M. et al.*, 6 Neb. App. 754, 765, 577 N.W.2d 547 (1998).

In *In re J.A.*, the Vermont Supreme Court explained the implications of the privilege against self-incrimination in child protection proceedings:

"We have held that '[t]he trial court cannot specifically require the parents to admit criminal misconduct in order to reunite the family.' *In re M.C.P.*, 153 Vt. 275, 300, 571 A.2d 627, 641 (1989). . . . We have also recognized, however, the importance of preventing a child from being subjected to an abusive environment and thus have held that reunification plans may require extensive therapy and counseling for sexually abusive parents. *Id.* at 300-01, 571 A.2d at 640-41. Furthermore, if the parents' denial of abuse interferes with effective therapy, then the court 'may act on that finding to the parents' detriment without offending the Fifth Amendment privilege.' *Id.* at 301, 571 A.2d at 641. Therefore, the additional requirement that the stepfather successfully complete counseling was valid and appropriate." *In re J.A.*, 166 Vt. at 626.

In affirming both the district court and the Court of Appeals, we decline to adopt an absolute rule that requiring an admission of abuse as a condition of reunification violates a parent's rights under the Fifth Amendment. CINC proceedings must, however, be conducted within constitutional limits. If social service agencies find it necessary to require parents to provide a reasonable explanation for a child's injuries, incriminating information may not be compelled from the parents under the threat of a substantial penalty and then used against the parents in criminal prosecutions. The decision in the present case does not place limits on the State's mandate to provide protection for abused and neglected children. This case holds, however, that if a parent is compelled to admit to criminal acts or face the loss of his or her parental rights, the incriminating statements will be excluded from evidence when the parent becomes a defendant in criminal proceedings.

The Court of Appeals was correct in affirming the suppression of Brown's confession based on a violation of his constitutional privilege against self-incrimination. We find it unnecessary under the facts of this case to extend this analysis to determine whether the confession was also inadmissible under Fourteenth Amendment due process requirements.

The well-reasoned judgments of the district court and the Court of Appeals are affirmed.