**STATE**

v.

**Victor H. GONZALEZ.**

No. 2007–2–M.P.

Supreme Court of Rhode Island.

Jan. 13, 2010.

---

Jane M. McSoley, Department of Attorney General, for Plaintiff.

Paula Rosin, Office of the Public Defender, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, JJ, and WILLIAMS, C.J. (ret.).

## OPINION

Justice ROBINSON for the Court.

The defendant, Victor H. Gonzalez, appears before this Court pursuant to our having granted his petition for a writ of certiorari.[1] He alleges that the hearing justice committed reversible error in denying his motion to suppress a confession that he made to the police, in which confession he admitted to having engaged in sexual contact with his girlfriend's minor daughter.

For the reasons set forth in this opinion, we affirm the judgment of conviction.

## I

### Facts and Travel

On December 9, 2004, defendant was arrested. He was subsequently charged by criminal information with four counts of second-degree child molestation sexual assault stemming from his alleged sexual contacts with a person under fourteen years of age (*viz.,* one of his girlfriend's daughters). These four counts involved alleged violations of G.L.1956 § 11–37–8.3.[2] Counts 1 and 3 charged defendant with sexual contact with the breast area of the minor complaining witness. Count 2 alleged improper contact with her vaginal area.[3]

The alleged offenses took place between October 1, 1998 and June 30, 2000; they were perpetrated against a minor child whom we shall call Kaitlin.[4] Kaitlin was between approximately ten and twelve years old when the alleged assaults occurred.[5] Kaitlin is the daughter of Caroline, the woman with whom defendant was living in Pawtucket at the time of the incidents at issue.

In December of 2004, allegations of child molestation with respect to Kaitlin came to the attention of the Department of Children, Youth and Families (DCYF) after Kaitlin had discussed certain alleged sexual assaults with a counselor, who then pro-

---

1. Due to an error that is not attributable to defendant, no timely notice of appeal was filed on his behalf. Accordingly, he sought this Court's review by filing a petition for writ of certiorari, which we granted.

2. General Laws 1956 § 11–37–8.3 provides as follows: "A person is guilty of a second degree child molestation sexual assault if he or she engages in sexual contact with another person fourteen (14) years of age or under."

3. The criminal information also contained a fourth count. However, in view of the testimony elicited at trial, that fourth count was dismissed pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure.

4. We shall refer to the several civilians involved in this case pseudonymously in order to protect their privacy.

5. The complaining witness's date of birth is January 18, 1988.

ceeded to notify DCYF about the purported incidents. After DCYF reviewed the allegations and after the police conducted an investigation (as more fully described below), Mr. Gonzalez was charged by criminal information with the above-referenced counts of second-degree child molestation. The case was eventually reached for trial in the Spring of 2006.

## A

### The Motion to Suppress

Before a jury was impaneled, defendant moved to suppress certain incriminating statements that he had made to the Pawtucket police during their investigation; in those statements he admitted to having inappropriately touched Kaitlin's breasts (although he denied having had contact with her vaginal area). On May 25 and 26, 2006, a hearing was held in the Superior Court on defendant's motion to suppress. At the suppression hearing, the hearing justice heard the testimony of just two witnesses—*viz.*, Pawtucket Police Detective John McIlmail [6] and Mr. Gonzalez himself. At the conclusion of the hearing, the hearing justice denied defendant's motion to suppress; it is the correctness *vel non* of that ruling that is the only issue before us.

### 1. The Testimony of Detective John McIlmail

Detective John McIlmail testified that, on December 9, 2004, he was called at home and asked to return to the police station to investigate an allegation of child molestation. When he arrived at the po-

lice station, he encountered Kaitlin, Caroline, and Mr. Gonzalez—all of whom were in the waiting area of the police station.

Detective McIlmail first interviewed Kaitlin with her mother (Caroline) also being present. Detective McIlmail testified that Kaitlin informed him that, several years earlier, her mother's boyfriend, Victor Gonzalez, had (in the detective's words) "felt her breasts area underneath her clothing and rubbed her vagina." Kaitlin told him that these incidents of touching had occurred when she was in the fifth or sixth grade and at times when she was home with defendant while her mother was at work and her younger sister was in another room. Kaitlin executed a written statement summarizing her allegations.

Detective McIlmail testified that he then spoke with Kaitlin's mother, Caroline, who informed him that the subject of Mr. Gonzalez allegedly having inappropriately touched Kaitlin had been discussed among family members a couple of years before the decision to bring the allegations to the attention of the police. She said that, in that family discussion context, defendant had admitted to having touched Kaitlin inappropriately.

Detective McIlmail further testified that he next interviewed defendant [7] with Detective Lieutenant Lance Trafford also being present in the interview room. During the interview, both officers were in plain clothes and were not dressed in uniform. Detective McIlmail testified that, prior to commencing a discussion with defendant, he gave him a rights form, which set forth

6. Although he was no longer a member of the Pawtucket Police Department at the time of the hearing on the motion to suppress, John McIlmail was a detective in that department at the time of the 2004 investigation into Kaitlin's accusations. In this opinion, we shall refer to him as Detective McIlmail.

7. While Kaitlin and Caroline were being interviewed, defendant had remained in the waiting area of the police station.

the *Miranda*[8] rights; he stated that he asked Mr. Gonzalez to read the form. Detective McIlmail testified that Mr. Gonzalez read the form without asking any questions and gave no indication that he did not understand what was written on the form. The detective testified that defendant then signed and dated the form and placed a check mark next to the word "YES" that appeared on the rights form next to the statement: "I understand my rights." [9] Detective McIlmail and Detective Trafford also signed the form.

Detective McIlmail testified that, after defendant had read and signed the rights form, he informed defendant that he was a suspect and that allegations had been made by Kaitlin to the effect that he had touched her inappropriately. Detective McIlmail further testified that Mr. Gonzalez acknowledged that he had indeed touched Kaitlin inappropriately and that he was sorry for what he had done. The detective stated that defendant admitted that, a few years earlier, he had been in the same room as Kaitlin and (in the detective's words) "she had grabbed his hand and put it near her chest and he began to rub her chest." Detective McIlmail said that defendant admitted that such conduct had taken place "a few times" over the course of "a few months."

Detective McIlmail further testified that defendant wrote out a signed statement describing the above-referenced occurrences, which statement he and Detective Trafford also signed. Detective McIlmail testified that neither he nor Detective Trafford told defendant what to write in the statement; he added that neither officer physically touched defendant. Detective McIlmail stated that, when he had brought defendant from the waiting area to the conference room, he had a strong suspicion that defendant would be charged; he acknowledged that, if defendant had attempted to leave the police station at that point in time, he would not have been free to leave. However, Detective McIlmail also testified that, although defendant was told that he was suspected of second-degree child molestation, he was not told that he was not free to leave the police station, nor was he placed in handcuffs or other restraints while speaking to the detectives in the conference room.

Detective McIlmail additionally testified that defendant informed him of the contact that he had had with a DCYF investigator.[10] Detective McIlmail testified that he did not recall defendant's having stated to him that the DCYF investigator had threatened to take away the children with whom he resided if he did not go to the police and make a statement.

It was further Detective McIlmail's testimony that, after defendant made his incriminating statements, he was placed in the police station's cell block; he added that, prior to that time, defendant had not been locked up or otherwise restrained.

## 2. The Testimony of Defendant Victor Gonzalez

At the hearing on the motion to suppress, Mr. Gonzalez testified that, in December of 2004, he was living in an apartment in Pawtucket with Caroline and her

---

**8.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**9.** Detective McIlmail also testified that defendant spoke in English when making his incriminating statements after he signed the rights form.

**10.** The DCYF investigator to whom we make reference in the text was one of that agency's child protective investigators (CPIs). For the sake of simplicity and consistency, we shall hereinafter refer to said person as "the DCYF investigator."

two daughters (Kaitlin and Cynthia) [11] and with the daughter that he had fathered with Caroline (Suzanne). He stated that, as of that point in time, he had been living with Caroline and the three girls for about seven years.

The defendant further testified that, on December 9, 2004, he came home to the apartment and was informed by Caroline and Kaitlin that an investigator from DCYF wanted to speak with him. He also testified at the suppression hearing that he did in fact speak with the DCYF investigator and was asked by her whether he had touched Kaitlin; he testified that, after looking over at Caroline, he had responded: "[Y]es, I did."

The defendant also testified that, after the meeting with the DCYF investigator in the apartment, he and Caroline and Kaitlin all proceeded to go to the Pawtucket police station together; he said that he went there because the DCYF investigator had told him that, if he did not go to the police station and fill out papers, she was going to take his daughter and Caroline's daughters from the home.

The defendant testified that he and Caroline and Kaitlin waited approximately fifteen or twenty minutes in the waiting area of the police station before the officers called Kaitlin to talk with them in another room; Caroline accompanied Kaitlin to that interview. The defendant remained in the waiting area after Kaitlin and Caroline left that area to go with the officers; he testified that he thought that he could have walked out of the station if he had wanted to.

Mr. Gonzalez further testified that, after he had been in the waiting area for more than an hour and a half, a detective asked him to come to another room, at which point defendant was told that he was suspected of child molestation. Mr. Gonzalez testified that there were two officers in the room and that they gave him a piece of paper and asked him to read it—which, according to his testimony, he did; he added that he then told the officers that he understood the contents of the piece of paper.

The defendant testified that the police did not threaten him at all, but he added that he told the police officers about what he described as "the threats" that he alleged the DCYF investigator had made to him. He stated that, because he felt that he hadn't done anything wrong, he would not have gone to the police station but for the fact that the DCYF investigator had told him to go there. The defendant testified that the Pawtucket police told him, and he understood, that he had the right to remain silent; but he added that he felt threatened by the DCYF investigator's comments that, if he did not go to the police station and fill out papers, the children would be taken away. The defendant also testified that the DCYF investigator had told him that, if he went to the police station and filled out papers, he was "not going to have any problem" and that "the Judge is going to be on [defendant's] side." He testified that the reason that he acted as the DCYF investigator had indicated was that he would do anything to keep the children and to prevent the children from being removed from the home.

It was further defendant's testimony at the suppression hearing that, a couple of years [12] before he made the incriminating

11. Kaitlin and Cynthia are the biological children of Caroline, but not of defendant.

12. The record does not indicate with greater precision just when the earlier admissions were made by defendant. In response to a question posed to him during his cross-examination at the suppression hearing, Mr. Gonzalez agreed that those admissions were made "a couple of years" earlier.

statements at the Pawtucket police station in December of 2004, he had been confronted by Caroline and her sister and that he had admitted to having touched Kaitlin inappropriately. He testified that the reason that he admitted to those family members that he had touched Kaitlin was because they were screaming at him and asking him to tell them that he did it; he added that he did not like people screaming at him. It was his testimony that he told the police that he had apologized to Caroline and her sister on that earlier occasion for something that in actuality he had never done.

The defendant then testified that he "never did anything to [Kaitlin] * * *." He stated that, before he wrote his own statement at the police station, he read Kaitlin's statement to the police and then essentially copied the information set forth in her statement. When he was cross-examined at the suppression hearing with respect to his assertion that he had copied Kaitlin's written statement, defendant could not explain why in his police statements he admitted to having touched Kaitlin's chest, but denied ever touching her vagina—even though, in her written statement to the police (from which defendant said he had copied), Kaitlin had explicitly alleged that defendant had touched her in *both* areas.[13]

At the hearing on the motion to suppress, Mr. Gonzalez contended that his statements to the Pawtucket police should be suppressed because they were not given freely—due to the fact that, according to him, they were coerced by threats made by the DCYF investigator. The prosecution argued that defendant was not in custody at the police station at the time that he made the incriminating statements; the

prosecution further contended that, even if defendant had been in custody, he knowingly, intelligently, and voluntarily waived his right to remain silent and proceeded to make the incriminating statements.

At the conclusion of the suppression hearing, the hearing justice found that, based on the facts and circumstances before her, the prosecution had established by clear and convincing evidence that defendant's confession was voluntary. Accordingly, the hearing justice denied defendant's motion to suppress the statements.

### B

### The Trial

After the motion to suppress was denied, a trial was held from June 5 to June 8, 2006. On June 9, the jury returned a verdict of guilty on counts 1 and 3 (alleging sexual contact with Kaitlin's breasts); the jury found defendant not guilty of count 2 (alleging sexual contact with Kaitlin's vaginal area).

On June, 27, 2006, defendant filed a motion for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure; the trial justice denied that motion. Thereafter, on September 7, defendant received two concurrent sentences of ten years of imprisonment, with four years to serve and the remainder suspended, with probation.

### C

### The Instant Appeal

The defendant challenges the denial of his pretrial motion to suppress the incriminating statements that he made to the

---

13. In defendant's written statement to the police he stated that Kaitlin "pull my hand and put it over her chest, and it clicked my mind and started touching her * * * I touch her legs, but, I never touch her vagina or else."

Pawtucket police in December of 2004. He contends that the hearing justice erred in denying the motion to suppress the statements; he asserts that those statements were the product of state coercion in violation of his state and federal constitutional privilege against self-incrimination.[14]

## II

### The Standard of Review

■ When ruling on a motion to suppress, a hearing justice should admit a confession or other incriminating statements only "if the state can first prove by clear and convincing evidence that the defendant knowingly, intelligently, and voluntarily waived his [or her] constitutional rights expressed in *Miranda v. Arizona* * * *." *State v. Bido*, 941 A.2d 822, 835 (R.I.2008) (quoting *State v. Dumas*, 750 A.2d 420, 423 (R.I.2000)); *see also State v. Taoussi*, 973 A.2d 1142, 1146 (R.I.2009); *State v. Dennis*, 893 A.2d 250, 260 (R.I. 2006); *State v. Humphrey*, 715 A.2d 1265, 1273 (R.I.1998).

We employ a two-step analysis when we review a hearing justice's decision with respect to a motion to suppress a statement that was allegedly made involuntarily. *Taoussi*, 973 A.2d at 1146; *Bido*, 941 A.2d at 835.

■ The first step calls for a review of the hearing justice's findings of the historical facts that are relevant to the issue of voluntariness of the confession. *Taoussi*, 973 A.2d at 1146; *Bido*, 941 A.2d at 835. We will not overturn a hearing justice's findings of historical facts with respect to voluntariness unless those findings are clearly erroneous. *Taoussi*, 973 A.2d at 1146; *Bido*, 941 A.2d at 835; *Humphrey*, 715 A.2d at 1273. We have stated that a finding is clearly erroneous "when, although there is evidence to support it, the reviewing court on the basis of the entire evidence is left with the definite and firm conviction that a mistake has been committed." *State v. LaRosa*, 112 R.I. 571, 576, 313 A.2d 375, 377 (1974); *see also Taoussi*, 973 A.2d at 1146; *State v. Perez*, 882 A.2d 574, 588 (R.I.2005).

We have further noted that we, like virtually all other appellate courts, traditionally accord "a great deal of respect to the factual determinations and credibility assessments made by the judicial officer who has actually observed the human drama that is part and parcel of every trial and who has had an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record." *In the Matter of the Dissolution of Anderson, Zangari & Bossian*, 888 A.2d 973, 975 (R.I.2006); *see also State v. DeOliveira*, 972 A.2d 653, 662 (R.I.2009) (stating that "the trier of fact is in the best position to assess the relative credibility of witnesses"); *State v. Woods*, 936 A.2d 195, 198 (R.I.2007); *Almeida v. Red Cap Construction, Inc.*, 638 A.2d 523, 524 (R.I. 1994) (stating that "[a] credibility determination is particularly within the province of the factfinder" and that such a determination will "not be lightly questioned by this [C]ourt").

■ If the hearing justice's findings of historical fact pass muster, the second step of our analytical process is to "apply those historical facts and review *de novo*

---

14. The Fifth Amendment to the United States Constitution provides in pertinent part that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself * * *."

Similarly, article 1, section 13 of the Rhode Island Constitution provides that "[n]o person in a court of common law shall be compelled to give self-criminating evidence."

the [hearing] justice's determination of the voluntariness of the statement." *Bido,* 941 A.2d at 836; *see also Taoussi,* 973 A.2d at 1146–47; *Humphrey,* 715 A.2d at 1274.[15] We have stated that a statement is *voluntary* if it is the "product of [the defendant's] free and rational choice." *Humphrey,* 715 A.2d at 1274 (quoting *State v. Amado,* 424 A.2d 1057, 1062 (R.I.1981)); *see also Taoussi,* 973 A.2d at 1147. By contrast, we have indicated that a defendant's statement is *involuntary* if it was "extracted from the defendant by coercion or improper inducement, including threats, violence, or any undue influence that overcomes the free will of the defendant." *Humphrey,* 715 A.2d at 1274; *see also Taoussi,* 973 A.2d at 1147. When passing upon the voluntariness *vel non* of a confession, this Court will examine "the totality of the circumstances surrounding the challenged statement" and will exercise its "independent judgment in determining whether [the] historical facts establish a deprivation of constitutional rights." *Humphrey,* 715 A.2d at 1274.

## III

### Analysis

■ In the course of denying defendant's motion to suppress his statements to the Pawtucket police, the hearing jus-

tice reviewed the testimony of Detective McIlmail as well as that of Mr. Gonzalez himself. Based upon this testimony, the hearing justice found that defendant was not in custody at the police station in Pawtucket on December 9, 2004, when he made the incriminating statements to the police.[16] She reasoned that defendant had gone to the police station voluntarily with Kaitlin and Caroline in order to make a statement about the allegations concerning his involvement in the alleged incidents of child molestation. The hearing justice further found that defendant's "freedom of movement was never curtailed," and she also noted that defendant had stated that he had felt free to leave the waiting area of the police station and that he was neither handcuffed nor subjected to force while waiting in that area. She further noted that defendant was not arrested until after he made his incriminating statements. The hearing justice found that, when he made his incriminating statements, defendant subjectively believed that he was free to leave.[17]

Significantly, the hearing justice clearly stated on the record that she did "not accept as fact that DCYF threatened to take the defendant's children if he did not give a police statement." The hearing justice stated that she was not convinced, after reviewing the testimony of defendant

---

**15.** The reason that we conduct a *de novo* review at the second step of our analytical process is because "the ultimate question of whether a confession was given voluntarily is legal in nature * * *." *State v. Dennis,* 893 A.2d 250, 261 (R.I.2006).

**16.** The hearing justice further found that, despite there being no constitutional requirement that *Miranda* warnings be given (due to the fact that defendant was not then in custody), defendant had in fact received such warnings prior to making his incriminating statements. The hearing justice additionally found that defendant had read the rights form and had indicated on the form that he under-

stood his rights. She further found that only *after* receiving such warnings did defendant then freely waive his right to remain silent by answering questions of the detectives and giving a written statement without any coercion or threats by the police.

**17.** The hearing justice noted that, despite Detective McIlmail's testimony that defendant would not have been free to leave once he was brought into the conference room to speak with the police officers, this fact was not communicated to defendant, who at that juncture was merely told that he was a suspect.

and the detective, that a threat was made by DCYF—although she acknowledged the possibility that the DCYF investigator may have *recommended* that defendant speak with the police. The hearing justice stated that, although defendant "may have believed that his children were at risk or in jeopardy if he did not give a statement," that was a "far cry" from defendant's confession being "the product of an express threat by DCYF to report the conduct to police or face such [a] risk."

The hearing justice stated that she was also "not at all convinced" by defendant's argument that, had he not been threatened by the DCYF investigator (as he alleged had happened), he would not have spoken to the police nor would he have made a confession. In reference to that allegation, the hearing justice pointed to defendant's inability to explain how confessing would help avoid DCYF intervention with respect to the three girls who lived with Caroline and him; the hearing justice characterized as "totally illogical" defendant's assertion that he thought that making incriminating statements to the police would help him and Caroline keep the children. The hearing justice reasoned as follows:

"It is far more logical that the defendant thought he would help himself by telling the police the same truths, albeit incomplete, by admitting to some touchings, but not others, that he had previously told [Kaitlin], [Caroline] and DCYF. In this Court's view, the defendant freely chose to make the statements he made at the time without any misconduct in the form of coercion or suppression of the defendant's will by the police involved in this investigation, with the defendant being careful not to corroborate in full the complaining witness's statements."

The hearing justice stated that "[t]he credibility of [the defendant's] suppression hearing testimony was shaken to [the] core at this juncture of cross-examination."

At the conclusion of the suppression hearing, the hearing justice found that defendant had made a voluntary decision to waive his right against self-incrimination and to make incriminating statements to the Pawtucket police detectives.

■ Of capital importance to the resolution of this case is the fact that the hearing justice expressly found that **no threat** was made to defendant by the DCYF investigator. In so finding, the hearing justice made a credibility assessment with respect to defendant's testimony: in plain English, the hearing justice stated that she did "not accept as fact that DCYF threatened to take the defendant's children if he did not give a police statement"—and there is no evidence in the record (other than defendant's disbelieved testimony) that a threat was made. It is a fundamental principle that credibility assessments are primarily the responsibility of hearing justices; they are deferred to by appellate courts except in instances where the trial court failed to touch all the right bases. *See, e.g., DeOliveira*, 972 A.2d at 662 ("We are mindful of the fact that the trier of fact is in the best position to assess the relative credibility of witnesses."); *see also Woods*, 936 A.2d at 198 ("We do not have the same vantage point as the presiding judge, and we are unable to assess the witness' demeanor, tone of voice, and body language. Our perspective is limited to analyzing words printed on a black and white record."); *State v. Bourdeau*, 448 A.2d 1247, 1249 (R.I.1982) (stating that, unless the trial justice acted "arbitrarily or capriciously in assessing the credibility of the witnesses at the hearing," such findings of credibility will be given deference). In this instance, we have carefully reviewed the record, and we can perceive no basis for holding that the hearing justice's credibility assessment

with respect to defendant's testimony about a threat was erroneous.

Accordingly, we next proceed to conduct a *de novo* review of the trial justice's application of those historical facts and her ultimate determination with regard to the voluntariness of defendant's statements. *See Taoussi*, 973 A.2d at 1146–47.

The hearing justice found that defendant voluntarily waived his right against self-incrimination when he made incriminating statements to the detectives at the Pawtucket police station. After taking into account the "totality of the circumstances" [18] and according appropriate deference to the hearing justice's findings of historical fact,[19] there is clearly sufficient evidence in the record to satisfy us as to the voluntary nature of both the oral and written statements that Mr. Gonzalez made to the Pawtucket police.

It is undisputed that defendant arrived at the police station voluntarily and of his own accord, in the company of both his girlfriend (Caroline) and the complaining witness (Kaitlin). Having arrived at the police station, he remained in the waiting area and believed that he was free to leave the police station if he so chose. When he met with the plainclothed detectives, defendant was provided with a rights form that set forth his *Miranda* rights; he testified that he read and understood the form and that he signed it. The defendant communicated with the detectives in English and later was able to provide a written statement in the English language. Further, no evidence was proffered that would suggest that defendant was subjected to coercion by the detectives in the form of verbal threats or intimidation or physical force. Mr. Gonzalez was not restrained or handcuffed; he retained his freedom of movement while at the police station until the point in time when he made the incriminating statements. Only then was he placed in the cell block.

Having reviewed the record of the suppression hearing, we are unable to perceive any basis for ruling that the analysis conducted by the hearing justice was erroneous.

On appeal, defendant contends that our recent decision in *State v. Oliveira*, 961 A.2d 299 (R.I.2008) is controlling with respect to his case. In *Oliveira*, we held that the admission at trial of certain incriminating statements which the defendant made to a DCYF investigator, who had spoken with the defendant after he had been arraigned and while he was being held at the Adult Correctional Institutions on charges of first-degree child molestation, violated the defendant's Sixth Amendment right to counsel. *Id.* at 304. Mr. Gonzalez contends that this Court should find that his incriminating statements to the Pawtucket police detectives were similarly unconstitutional—in view of what he describes as "threats" allegedly made by the DCYF investigator to him.

It is obvious that there are some superficial factual similarities between what transpired in the *Oliveira* case and what took place in the case at bar: most notably, each case involves the interaction be-

**18.** *See, e.g., Reck v. Pate*, 367 U.S. 433, 440, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961) ("[A]ll the circumstances attendant upon the confession must be taken into account."); *State v. Apalakis*, 797 A.2d 440, 446 (R.I.2002) ("To determine whether a statement was voluntary, this Court looks to the totality of the circumstances.").

**19.** We review with deference the findings of historical fact due to the fact that the hearing justice had the opportunity to hear and observe the witnesses and to make credibility determinations based on those observations. *See State v. Taoussi*, 973 A.2d 1142, 1146 (R.I.2009).

tween a DCYF investigator and a person accused of child molestation.

Upon analysis, however, it is clear that defendant's reliance on *Oliveira* is unavailing. *Oliveira* was expressly decided on Sixth Amendment grounds, whereas there is absolutely no allegation in the instant case of any violation of defendant's Sixth Amendment rights; the whole focus of defendant's argument on appeal is on his right against self-incrimination. *Oliveira* focused on the admission of a statement made to a DCYF investigator by a detainee at the ACI whose right to counsel had already attached. In that case, we held that the detainee "was denied the basic protection of [the right to the assistance of counsel] when there was used against him at trial evidence of his own incriminating words." *Oliveira*, 961 A.2d at 311 (quoting *Maine v. Moulton*, 474 U.S. 159, 173, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985)). In the case at bar, however, the Sixth Amendment is not implicated. Moreover, as we have emphasized, the hearing justice expressly found that no threat was made in this case—and, therefore, there exists no basis for triggering close Fifth Amendment review.

The defendant further argues that his situation is controlled by the principles set forth in *Lynumn v. Illinois*, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963). In *Lynumn*, three police officers and an informant, who had purportedly "set up" the defendant, were found to have "encircled [the defendant] in her apartment" after the officers had seized and arrested her. *Id.* at 534, 83 S.Ct. 917. The officers then threatened the defendant, indicating that, unless she cooperated and told them that she had sold marijuana to the informant in a sting operation, state financial aid to the defendant's infant children would be cut off and her children would be taken from her. *Id.* The United States Supreme Court held that the threats made by the police rendered the defendant's incriminating statements involuntary under the circumstances and the admission of those statements at trial was violative of her Fifth Amendment privilege against self-incrimination. *Id.*

The defendant's contention that *Lynumn* is applicable to the case at bar is simply untenable in light of the hearing justice's express finding of fact (which we have held to be not clearly erroneous) that **no such threats were made** to Mr. Gonzalez. In stark contrast, in *Lynumn*, the police officers did not deny that they made threats to the defendant, including the threat that, if she did not cooperate and was arrested, her children would likely be taken away and her state-funded aid would be cut off. *Lynumn*, 372 U.S. at 532–34, 83 S.Ct. 917 . We therefore find *Lynumn* to be inapposite to the case at bar, since the hearing justice in this case found that no threat was made.[20]

---

**20.** The defendant also cites as supporting authority a case recently decided by the Supreme Court of Kansas, *State v. Brown*, 286 Kan. 170, 182 P.3d 1205 (2008). In *Brown*, the Kansas Department of Social and Rehabilitation Services required that, in order to avoid termination of their parental rights, the parents were required to confess to the police how their child's injuries were sustained. *Id.* at 1211. The Kansas court held that the defendant-father's confession to the police, on the day of the scheduled court hearing with respect to the termination of the defendant's parental rights, was not voluntary and violated his right against self-incrimination. *Id.* at 1212. The Court reasoned that the defendant's predicament constituted "a classic penalty situation," which required him to either give up his right against self-incrimination or lose his parental rights. *Id.*

We reject defendant's contention that *Brown* is relevant to his case. The case at bar is plainly distinguishable from *Brown* because the hearing justice in the present case found (and we have upheld that finding) that there was **no threat made by the DCYF investigator**

## IV

### Conclusion

For the reasons set forth in this opinion, the defendant's appeal is denied and dismissed, and the judgment of conviction is affirmed. The record in this case may be returned to the Superior Court.

to Mr. Gonzalez. Accordingly, in view of the absence of a threat, defendant's situation cannot be said to have constituted "a classic penalty situation," such as existed in *Brown*. Whether the rationale of *Brown* would be persuasive in a different factual scenario is an issue that we need not and do not reach.